811 F.2d 136
 55 USLW 2462, 7 Fed.R.Serv.3d 389, 22
Fed. R. Evid. Serv. 737,
13 Media L. Rep. 2041
 Martha von BULOW, by her next friends Alexander AUERSPERG
and Annie Laurie Auersperg Kneissl, Plaintiff-Appellee,
v.
Claus von BULOW, Defendant,
Andrea Reynolds, Third Party Witness-Appellant.
 Nos. 695, 698 and 699,
Dockets 86-7962, 86-7982 and 86-7984.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 19, 1986.
Decided Feb. 10, 1987.
Certiorari Denied April 20, 1987.
See 107 S.Ct. 1891.
 
 John S. Siffert, New York City (Patricia McDonagh, Sheila B. Rathbun, Jason G. Luchan, and Lankler Siffert & Wohl, New York City, on the brief), for third party witness-appellant Andrea Reynolds.
 Frederic W. Parnon, New York City (Ivan Kline, Melissa A. Cohen, Michael F. Armstrong, and Barrett Smith Schapiro Simon & Armstrong, New York City, on the brief), for appellee Martha von Bulow.
 Before TIMBERS, MESKILL and KEARSE, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 The essential question presented on this appeal from a civil contempt order entered against a witness is whether the contemnor is entitled to claim a journalist's privilege. Under the circumstances of this case, we hold that she is not. Other subordinate questions are presented.
 
 
 2
 The appeal has its genesis in certain civil litigation commenced by Martha von Bulow by her two children as her next friends (collectively referred to as "appellee") against her husband Claus von Bulow ("von Bulow").
 
 
 3
 The third party witness appellant Andrea Reynolds ("Reynolds") appeals from the contempt order against her announced from the bench on November 18, 1986 in the Southern District of New York, John M. Walker, District Judge.[1] The contempt order, being a final appealable order, brings up for review two prior production orders entered October 15 and October 28, which, standing alone, of course would not be appealable since they are interlocutory orders.
 
 
 4
 The October 15 order directed Reynolds to produce certain documents subpoenaed by appellee. 652 F.Supp. 823. Those documents consisted of investigative reports commissioned by Reynolds on the lifestyle of Martha von Bulow's children, notes taken by Reynolds while observing the criminal trial of von Bulow, and the manuscript to date of an unpublished book being written by Reynolds about the events surrounding the von Bulow prosecution. Although Reynolds submitted the investigative reports and the notes to the court in camera, she retained the manuscript. The court held that all of the documents were discoverable and ordered production of them after examining, and rejecting, Reynolds' claim that the documents were protected from discovery by the journalist's privilege. The court also rejected Reynolds' alternative claim that the documents were protected by the attorney-client privilege.
 
 
 5
 The October 28 order governed the confidentiality of the documents. The order sought to protect the commercial viability to Reynolds of the documents and, accordingly, limited disclosure of the documents to appellee, her next friends and their attorneys for the sole purpose of litigating appellee's action against von Bulow.
 
 
 6
 The November 18 order held Reynolds in civil contempt of court for her continued refusal to produce the manuscript. The court ordered that Reynolds pay a fine of $500 per day, but stayed payment of the fine pending a determination by our Court of the validity of the contempt order. The court further ruled that it would retain possession of the in camera documents pending that determination.
 
 
 7
 On appeal, Reynolds argues that the First Amendment protects the subpoenaed documents and hence that she has the right to assert the journalist's privilege as a protective shield. In the alternative, Reynolds argues that she is entitled to assert an attorney-client privilege based upon her status as a "paralegal" for the defense team during the criminal prosecution of von Bulow. On these grounds, Reynolds contends that the district court erred in holding her in contempt. We disagree. We hold that Reynolds is not a member of the class entitled to assert the journalist's privilege. We also hold that an attorney-client privilege is unavailable to her.
 
 
 8
 We affirm the district court's orders of contempt, production, and confidentiality.
 
 I.
 
 9
 We summarize only those facts believed necessary to an understanding of the issues raised on appeal.
 
 
 10
 The underlying complaint alleges that von Bulow put appellee into her current state of permanent coma by injecting her surreptitiously with insulin and other drugs. The complaint alleges one federal law claim based on the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 et seq. (1982) ("RICO") and nine state law claims based on pendent and diversity jurisdiction.
 
 
 11
 Reynolds is an intimate friend of von Bulow. She was his steady companion during the Rhode Island state criminal proceedings which resulted eventually in his acquittal after a second trial on charges of assault with intent to murder his wife. On May 28, 1986 attorneys for appellee, in preparation for the instant litigation, subpoenaed Reynolds to testify and to produce certain documents at her deposition. Among the documents subpoenaed was "any book being written" about the von Bulow matter.
 
 
 12
 Reynolds failed to respond to the subpoena. On July 25 the district court ordered appellee to proceed by order to show cause to require Reynolds to show why she should not be held in contempt for her failure to respond to the subpoena and to produce the subpoenaed documents. The order to show cause was signed by the district court on July 30. It was served on Reynolds who responded pro se in a letter to the district court dated August 6. In that letter Reynolds denied the existence of the documents which had been subpoenaed, with one exception. That exception was delineated by Reynolds as "the manuscript of my story of the von Bulow affair". This she declined to produce.
 
 
 13
 Along with the letter, Reynolds submitted to the court for in camera inspection two investigative reports she had commissioned on the lifestyles of Martha von Bulow's children, stating that she had ordered the reports because "[the children's] credibility was something I had to establish not only for the [von Bulow criminal] case, but also for my own peace of mind."
 
 
 14
 Reynolds also submitted to the court approximately 51 pages of handwritten notes, explaining that "[h]aving been barred from [the Rhode Island criminal] court [during the von Bulow trial], I watched the trial in one of the generator trucks, involved in satellite communication. During those long hours, I made some notes. (Worthless doodles, I think.)"
 
 
 15
 On August 19 the district court heard oral argument on the order to show cause. Reynolds appeared pro se. She argued that the production of the manuscript was protected by the evidentiary privilege accorded to journalists. The district court, indicating to Reynolds that it was "bending over backwards because you are not represented by an attorney right now", agreed to permit Reynolds to develop a record to support the claimed privilege by testifying at a deposition. The court urged Reynolds to reconsider her decision to proceed pro se. The court stated, "I think that does place you at a disadvantage in a proceeding like this."
 
 
 16
 Her deposition was taken on August 27. Reynolds again appeared pro se. She stated that she wished to claim the journalist's privilege along with "any other privilege that exists under the sun." To support her claim to a journalist's privilege, Reynolds produced a press card from Polish Radio and Television issued in 1979. She also asserted that she "was acting as a writer" for the German magazine Stern, that she had "drafted" an article about von Bulow that had appeared in Stern, and that she had supplied a German editor with a "long" article on von Bulow. Further, she stated that the New York Post had issued her a police/press pass for the von Bulow trial. She produced a letter from the former Metropolitan Editor of the Post which stated that he had solicited Reynolds to cover the von Bulow trial for that newspaper. Finally, she produced a telex from a German publishing agency which indicated that Reynolds' "final work" would be serialized by that agency pursuant to an August 1985 agreement.
 
 
 17
 During the deposition, Reynolds stated that she had never published any writing under her own signature, that the negotiations with the Post had never come to fruition, that the manuscript was not prepared under contract, and that her relationship with the publisher of her proposed book "has nothing to do with my privileges as a journalist". Reynolds declined to make more specific her claim that she had worked as a "paralegal" on the defense team during the von Bulow trial. She also declined to discuss the rationale for her claim to a scholar's privilege, indicating that her understanding of the court's order was that her deposition was to be taken solely on the issue of the journalist's privilege.
 
 
 18
 A transcript of the deposition, along with subsequent correspondence from Reynolds and appellee's counsel, was submitted to the court. On October 15 the court filed a well reasoned opinion in which it denied Reynolds' claim of a journalist's privilege and ordered production of the in camera documents and the manuscript. The court held that, for protection under the journalist's privilege to be available to a witness, that witness must be involved actively in the gathering and dissemination of news. It held that Reynolds was not so involved. It stated that, although Reynolds claimed to have published an article in Stern, the Stern article in fact identified Reynolds' husband as the author. It observed also that the Post never had published anything written by Reynolds. Finally, the court concluded that, since Reynolds was not a member of the class of potential witnesses to whom the journalist's privilege was available, it was not necessary for the court to perform the detailed analysis of competing considerations required by the First Amendment balancing test. See In re Petroleum Products Antitrust Litigation, 680 F.2d 5, 7-8 (2 Cir.), cert. denied, 459 U.S. 909 (1982).
 
 
 19
 The court then directed appellee and Reynolds to submit proposed orders which would govern the confidentiality of the documents to be produced. The court outlined for the parties what the order should contain. On October 20 counsel for appellee submitted a proposed confidentiality order to the court. On October 24 Reynolds submitted a letter in response. The letter was divided into two segments, one entitled "Reargument", the other entitled "Proposed Order". In the reargument segment, Reynolds again asserted her claim to an attorney-client privilege arising from her role as a paralegal during the von Bulow trial. In the segment which addressed the confidentiality order, Reynolds, although continuing to assert that no proposed order could protect her rights adequately, suggested alterations to appellee's proposal.
 
 
 20
 The court denied the attorney-client claim with a memorandum endorsement, stating that the claim was without substantial factual support. With one additional protective provision inserted, the court signed the confidentiality order as proposed by appellee. The order was entered on October 28.
 
 
 21
 On November 7, present counsel for Reynolds wrote to the court confirming their representation of Reynolds. At a hearing held on November 12, counsel for Reynolds made a motion to certify a part of the production order for an interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982); to supplement the record; and for a stay of enforcement. The court declined to permit Reynolds to supplement the record and refused to grant certification pursuant to Sec. 1292(b), stating, "... frankly, I think she is toying with the court. I simply will not permit it. I have the highest respect for you [Reynold's counsel], but I think this eleventh-hour move on her part is reprehensible, frankly, and I am going to deny all the applications that you have made." The court, however, did give Reynolds one week to seek a stay from our Court pending appeal.
 
 
 22
 On November 19 a notice of appeal from the October 15 order of production was filed.
 
 
 23
 On November 18 the court sua sponte held Reynolds in contempt for failure to produce the documents and imposed a fine of $500 per day, the payment to be stayed pending appeal. The court denied requests by Reynolds to return the in camera documents to her, ruling that it would retain the documents pending a final determination by our Court.
 
 
 24
 On November 20 Reynolds filed notices of appeal from the confidentiality order and from the contempt order. On November 21, our Court consolidated the three appeals. Appellee agreed to a stay of the three orders pending appeal.
 
 II.
 
 25
 Discovery in civil litigation pending in a federal court is governed by the Federal Rules of Civil Procedure. These Rules paint with a broad brush. Fed.R.Civ.P. 26(b)(1) provides in relevant part that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." (emphasis added). The principles by which a federal court determines whether material sought is privileged are set forth in Fed.R.Evid. 501 which provides:
 
 
 26
 "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."
 
 
 27
 Before considering whether Reynolds is entitled to any privilege, we first must decide whether the privileges she seeks to invoke are governed by federal law or state law. The complaint in the instant action alleges a federal claim based on RICO and state law claims based on pendent and diversity jurisdiction. The evidence sought from Reynolds is relevant to both the federal and state claims. In such situations courts consistently have held that the asserted privileges are governed by the principles of federal law. E.g., Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3 Cir.1982); Memorial Hospital for McHenry County v. Shadur, 664 F.2d 1058, 1061 n. 3 (7 Cir.1981). This approach is consistent with the legislative history of Rule 501. The Senate Report which accompanied Rule 501 stated that "[i]t is also intended that the Federal Law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case." S.Rep. No. 1277, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 7051, 7059 n. 16. The instant case is a federal question case by virtue of the RICO claim; and pendent state law claims arise in the case. Accordingly, we hold that the federal law of privilege controls the question whether the privileges asserted by Reynolds should be recognized.
 
 
 28
 At the outset, we are mindful that testimonial exclusionary rules and privileges are not favored. "The Supreme Court has shown no enthusiasm for the creation of new constitutional privileges...." Herbert v. Lando, 568 F.2d 974, 998 (2 Cir.1977) (Meskill, J., dissenting), rev'd, 441 U.S. 153 (1979). This is because they contravene a fundamental principle of our jurisprudence that "the public ... has a right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331 (1950). Indeed, "these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974) (rejecting absolute Presidential privilege). Here we are asked to construe expansively the qualified privilege accorded journalists not to reveal confidential sources and information in judicial proceedings.[2] Specifically, we must decide whether one who gathers information initially for a purpose other than traditional journalistic endeavors and who later decides to author a book using such information may then invoke the First Amendment to shield the production of the information and the manuscript.
 
 
 29
 This question is one of first impression at least in this circuit. The question, moreover, does not appear to have been decided by any other court. In the light of "reason and experience", therefore, we turn to the First Amendment and to case law construing the journalist's privilege under that amendment. From these sources we shall attempt to glean the boundaries of the journalist's privilege as applied to this case.
 
 
 30
 We discern certain principles which we must use in determining whether, in the first instance, one is a member of the class entitled to claim the privilege. First, the process of newsgathering is a protected right under the First Amendment, albeit a qualified one. This qualified right, which results in the journalist's privilege, emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public. Second, whether a person is a journalist, and thus protected by the privilege, must be determined by the person's intent at the inception of the information-gathering process. Third, an individual successfully may assert the journalist's privilege if he is involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press. Fourth, the relationship between the journalist and his source may be confidential or nonconfidential for purposes of the privilege. Fifth, unpublished resource material likewise may be protected.
 
 A.
 
 31
 In Branzburg v. Hayes, 408 U.S. 665 (1972), the Supreme Court held that a journalist does not have an absolute privilege under the First Amendment to refuse to appear and testify before a grand jury to answer questions relevant to an investigation into the commission of crime. The case involved a story written by a reporter for the Louisville Courier-Journal on the illegal manufacture of hashish. The reporter personally had witnessed the hashish production and was subpoenaed by a Kentucky grand jury to testify about his experience. Branzburg appeared before the grand jury, but, claiming a First Amendment privilege, refused to reveal the identities of the individuals producing the illegal substance. The Court rejected the claim of privilege, basing its decision on the traditional importance of grand juries and the strong public interest in effective criminal investigation. The Court recognized, however, that a qualified privilege may be proper in some circumstances because newsgathering was not without First Amendment protection. Id. at 707 (emphasis added).
 
 
 32
 In Baker v. F & F Investment, 470 F.2d 778 (2 Cir.1972), cert. denied, 411 U.S. 966 (1973), we declined to apply Branzburg in a civil setting. Baker was a civil rights action in which racial discrimination in the sale of housing in the City of Chicago was alleged. In the course of discovery proceedings, the plaintiffs deposed the editor of the Columbia Journalism Review, who had written an article ten years earlier on "blockbusting". That article, published by the Saturday Evening Post, had been based upon information furnished to the editor by an anonymous real estate agent who gave the information under an agreement of confidentiality. At his deposition the editor refused to disclose the identity of his confidential source. The plaintiffs moved to compel him to do so. The district court denied the motion. We affirmed. We held that the public interest in non-disclosure of a journalist's confidential sources outweighed the public and private interest in compelled testimony. Central to our analysis in Baker was our concern that "[t]he deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting ... threatens freedom of the press and the public's need to be informed". Id. at 782 (emphasis added). This rationale suggests that the critical question in determining if a person falls within the class of persons protected by the journalist's privilege is whether the person, at the inception of the investigatory process, had the intent to disseminate to the public the information obtained through the investigation. A person who gathers information for personal reasons, unrelated to dissemination of information to the public, will not be deterred from undertaking his search simply by rules which permit discovery of that information in a later civil proceeding. Our holding in Baker provides no basis for claiming a journalist's privilege by persons who do not begin their investigations with an intent to disseminate information to the public, since no First Amendment rights are implicated under such circumstances.
 
 
 33
 On rare occasions the journalist's privilege has been invoked successfully by persons who are not journalists in the traditional sense of that term. In Silkwood v. Kerr-McGee Corp., 563 F.2d 433 (10 Cir.1977), the court was called upon to determine whether a documentary film maker, a third-party witness, was protected by a privilege from revealing confidential sources in his deposition. The witness was a film maker who organized a production company for the purpose of making a film having to do with the events surrounding the death of Karen Silkwood. The defendants sought to depose the film maker and, in connection with his deposition, subpoenaed documents and writings in connection with the film maker's investigation. The film maker appeared for the deposition but, invoking his First Amendment privilege, refused to answer questions which called for the disclosure of information given to him under agreements of confidentiality. The district court denied protective relief to the film maker. The Tenth Circuit first considered the effect on the validity of the journalist's privilege where the witness was not a regular newsman. It concluded that the fact that the film maker was not a salaried newspaper reporter did not, in and of itself, deprive him of the right to seek protective relief. The court therefore reversed the district court. The court reasoned that:
 
 
 34
 "His mission in this case was to carry out investigative reporting for use in the preparation of a documentary film. He is shown to have spent considerable time and effort in obtaining facts and information of the subject of this lawsuit, but it cannot be disputed that his intention, at least, was to make use of this in preparation of the film."
 
 
 35
 Id. at 436-37 (emphasis added). See also Apicella v. McNeil Laboratories, Inc., 66 F.R.D. 78 (E.D.N.Y.1975) (upholding assertion of privilege by chief executive officer of The Medical Letter on Drugs and Therapeutics, a technical journal with a circulation of 70,000 readers).
 
 
 36
 Other federal courts have held that the privilege can be invoked to shield disclosure of nonconfidential sources and nonconfidential information. E.g., United States v. Blanton, 534 F.Supp. 295, 296-97 (S.D.Fla.1982), aff'd, 730 F.2d 1425 (11 Cir.1984) (information sought was "gathered, developed or received by [reporter] in his professional newsgathering capacity" and nonconfidentiality of source of information was "irrelevant to chilling effect") (emphasis added); Loadholtz v. Fields, 389 F.Supp. 1299, 1300, 1303 (M.D.Fla.1975) (regarding materials developed by reporter in preparation of newspaper article, nonconfidentiality of source was "utterly irrelevant to 'chilling effect' on flow of information to press and public").
 
 
 37
 Journalists who seek to guard information that has not been published likewise have been accorded the protective shroud. "Like the compelled disclosure of confidential sources, [the compelled production of a reporter's resource materials] may substantially undercut the public policy favoring the free flow of information to the public that is the foundation of the privilege." United States v. Cuthbertson, 630 F.2d 139, 147 (3 Cir.1980), cert. denied, 454 U.S. 1056 (1981) (documents subpoenaed were resource materials pertaining to preparation of CBS investigative report ). See also United States v. Burke, 700 F.2d 70, 76-78 (2 Cir.), cert. denied, 464 U.S. 816 (1983) (documents sought were prepared by reporter in connection with news story ).
 
 
 38
 In examining the boundaries of the journalist's privilege, we may consider also the applicable state law, in this case New York's so-called "Shield Law", N.Y.Civ.Rights Law Sec. 79-h et seq. (McKinney Supp.1986). Although we are not bound to follow New York law, neither should we ignore New York's policy of giving protection to professional journalists. The Shield Law provides that a professional journalist shall not be held in contempt by any court for
 
 
 39
 "... refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication ... by which he is professionally employed or associated in a newsgathering capacity...." (emphasis added).
 
 
 40
 N.Y.Civ.Rights Law Sec. 79-h(b).
 
 
 41
 Thus, in order successfully to raise a claim of privilege under the New York Shield Law, a professional journalist must have obtained the information in the course of gathering news for publication. In People v. LeGrand, 67 A.D.2d 446, 415 N.Y.S.2d 252 (2d Dep't 1979), an author of a book was denied the protection of the Shield Law because the court found that he was not a "professional journalist" within the meaning of the statute. The court compared the characteristics of a professional journalist with those of the author before it and concluded that the statute's protections should not be expanded to protect the author. The court, however, did not rule out the possibility that, under different circumstances, the protections of the Shield Law could be invoked by an author: "The court defers comment at this time with respect to some future situation in which an author's role would be clearly that of an investigative journalist whose work product will be published in book form." Id. at 258 (emphasis added).
 
 
 42
 The underlying policies served by the New York Shield Law and federal law are congruent. Both "reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment, see e.g., New York Times v. Sullivan, 376 U.S. 254 (parallel citations omitted) (1964)." Baker v. F & F Investment, supra, 470 F.2d at 782.
 
 B.
 
 43
 "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." In re Grand Jury Subpoena Dtd. January 4, 1984, 750 F.2d 223, 224 (2 Cir.1984). Based on our analysis set forth above, we distill the essential characteristics of one entitled to invoke the journalist's privilege. We hold that the individual claiming the privilege must demonstrate, through competent evidence, the intent to use material--sought, gathered or received--to disseminate information to the public and that such intent existed at the inception of the newsgathering process. This requires an intent-based factual inquiry to be made by the district court.
 
 
 44
 The intended manner of dissemination may be by newspaper, magazine, book, public or private broadcast medium, handbill or the like, for "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." Lovell v. Griffin, 303 U.S. 444, 452 (1938).
 
 
 45
 Although prior experience as a professional journalist may be persuasive evidence of present intent to gather for the purpose of dissemination, it is not the sine qua non. The burden indeed may be sustained by one who is a novice in the field.
 
 
 46
 Further, the protection from disclosure may be sought by one not traditionally associated with the institutionalized press because "[t]he informative function asserted by representatives of the organized press ... is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." Branzburg v. Hayes, supra, 408 U.S. at 705. It is beyond peradventure that "[l]iberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." Id. at 704.
 
 
 47
 The primary relationship between the one seeking to invoke the privilege and his sources must have as its basis the intent to disseminate the information to the public garnered from that relationship. To this end, the source may be confidential or nonconfidential.
 
 C.
 
 48
 This brings us to the disposition of Reynolds' claim to the journalist's privilege in the case before us. As stated above, the burden was on Reynolds to establish that she had those characteristics which we have delineated as the essential attributes of a journalist. She failed to sustain her burden.
 
 
 49
 We consider, first, her claim that she is a journalist for the purpose of resisting compelled production of the investigative reports commissioned by Reynolds on the lifestyles of Martha von Bulow's children. In her letter of August 6 to the district court Reynolds stated that she had ordered the reports because the children's "credibility was something I had to establish not only for the [von Bulow criminal] case, but also for my own peace of mind." At oral argument before us Reynolds' counsel conceded that, when Reynolds commissioned the reports, "her primary concern was vindicating Claus von Bulow." There is no dispute, therefore, that, at the time she directed that the information be gathered, Reynolds did not intend to use the reports to disseminate information to the public. We hold that the reports are discoverable. Fed.R.Civ.P. 26(b)(1).
 
 
 50
 Turning next to the notes taken by Reynolds while watching the von Bulow trial on television, it is anomalous that Reynolds first characterizes these notes as "[w]orthless doodles" and then seeks to have this court robe them in the protective garb of the First Amendment. We decline to do so. Although Reynolds belatedly asserts that the notes were taken because of an agreement with the Post, this assertion is belied by the fact that Reynolds continued to make the notes even after negotiations with the Post proved to be fruitless. The district court was unable to find that Reynolds was engaged in any meaningful way in the gathering and dissemination of news while she attended von Bulow's criminal trial. The record supports this finding. We hold that the notes are discoverable. Fed.R.Civ.P. 26(b)(1).
 
 
 51
 Finally, we turn to the manuscript itself. Reynolds resists production of her manuscript on the ground that the author of such a manuscript, under a contract for publication, is protected automatically by the journalist's privilege. Her argument seeks to prove too much. We have held above that the talisman invoking the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences. Reynolds has not demonstrated this intent through competent evidence. Her letter to the district court dated August 6 stated that, with two exceptions, her book was based on material in the public domain. The two exceptions were "my memories and an investigative report I had ordered about [Martha von Bulow's children's] lifestyles." We have held that the investigative reports commissioned by Reynolds in and of themselves are not privileged. It is elementary that otherwise discoverable documents may not be converted into protected documents by taking some subsequent action with respect to them. Fisher v. United States, 425 U.S. 391 (1976). An individual's "memories" are not privileged by virtue of the First Amendment merely because, at a later date, those memories are committed to writing.
 
 
 52
 To the extent that Reynolds claims that production of the manuscript may not be compelled because it is based on sources who spoke to her under agreements of confidentiality, the force of that claim is undermined by her deposition testimony where she stated that her relationship with her confidential sources "stemmed from before I was writing the book". She testified:
 
 
 53
 "There were some people that I heard before the trial who said, 'You can divulge whatever you want to divulge to the lawyers of Mr. von Bulow.' You can imagine that in a trial of the magnitude of Mr. von Bulow's, I was beseiged with people who said they wanted to impart information, and they thought I would be the ideal recipient, not that I thought that they were right, necessarily."
 
 
 54
 Reynolds simply has not made the requisite showing that assurances of confidentiality were given by her out of journalistic necessity. In re Grand Jury Subpoena Dtd. January 4, 1984, supra, 750 F.2d at 225. Her testimony is equally consistent with acquiring confidential sources for reasons other than intent to disseminate edited versions of the information gathered.
 
 
 55
 Thus, our central inquiry as to whether Reynolds is entitled to claim a journalist's privilege must be answered in the negative. Since Reynolds gathered information initially for purposes other than to disseminate information to the public, we decline to serve as a judicial seamstress to alter the protective cloak of the First Amendment in order that it fit her now.
 
 III.
 
 56
 We come now to Reynolds' claim that production of the documents is protected by the shield of an attorney-client privilege. She argues that, based upon work she performed as a "paralegal" on the von Bulow criminal defense team in connection with the Rhode Island state criminal proceedings, she should not be required to comply with the production order. The district court rejected that claim. We agree.
 
 
 57
 Again, Reynolds asks us to construe expansively a privilege, in contravention of the search for truth, on the most meager of records. The law is clear in this circuit that a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof. In re Horowitz, 482 F.2d 72 (2 Cir.), cert. denied, 414 U.S. 867 (1973). "That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." In re Bonanno, 344 F.2d 830, 833 (2 Cir.1965). We agree with the district court that her claim of an attorney-client privilege lacks the required factual support.
 
 
 58
 The attorney-client privilege is founded on the assumption that encouraging clients to make the fullest disclosure to their attorneys enables the latter to act more effectively. Fisher v. United States, 425 U.S. 391, 403 (1976). We have recognized that an attorney's effectiveness depends upon his ability to rely on the assistance of various aides, be they "secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts." United States v. Kovel, 296 F.2d 918, 921 (2 Cir.1961). "[T]he privilege must include all the persons who act as the attorney's agents." 8 Wigmore, Evidence Sec. 2301 (McNaughton rev. 1961) (quoted in United States v. Kovel, supra, 296 F.2d at 921). The question is a simple one. Was Reynolds an agent of an attorney and has she presented sufficient evidence of this relationship? In other words, were communications made to her, in confidence, in her capacity as an agent of an attorney for the purpose of obtaining legal advice from that attorney? United States v. Kovel, supra, 296 F.2d at 922 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.") (emphasis in original). We think not. Rather, instead of competent evidence, Reynolds makes blanket assertions seeking to invoke an attorney-client privilege. She has not given the name of any attorney for whom she served as agent. A letter from a von Bulow attorney merely acknowledges that she attended legal strategy and planning sessions for the criminal case, but does not explicate any professional reasons for her attendance.
 
 
 59
 As for the subpoenaed documents themselves, Reynolds informed the district court in her letter of August 6 of her personal reasons for commissioning the investigative reports. With regard to the notes taken while she watched the criminal trial on television, Reynolds testified in her deposition that she had "stopped working as a paralegal when the trial started." She therefore cannot claim now that she was acting as the agent of an attorney in taking the notes. Finally, we decline Reynolds' invitation to extend the attorney-client privilege to a manuscript which she intends to publish. To accept such an invitation would serve poorly the teaching that "[t]he investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion of [the] privilege[ ]." 8 Wigmore, Evidence Sec. 2192, at 73 (McNaughton rev. 1961) (quoted in United States v. Kovel, supra, 296 F.2d at 921).
 
 IV.
 To summarize:
 
 60
 We affirm the orders of the district court which directed Reynolds to produce the subpoenaed documents under an order of confidentiality and which held her in civil contempt of court for failing to do so. We hold that an individual claiming the journalist's privilege must demonstrate, through competent evidence, the intent to use material sought to disseminate information to the public and that such intent existed at the inception of the newsgathering process. Reynolds having failed to sustain that burden, we refuse to accord the journalist's privilege to her. We also hold that the subpoenaed documents are not shielded from production by the attorney-client privilege. Reynolds was not acting as an agent of an attorney when she gathered the information contained in the documents.
 
 
 61
 These being expedited appeals, we order that the mandate issue ten (10) days from the date of the filing of this opinion to enable appellant, if she is so advised, to apply to the Supreme Court of the United States for a further stay of the issuance of the mandate pending the filing of a petition for a writ of certiorari. If such further stay is granted by the Supreme Court and if appellant files a timely petition for a writ of certiorari, then further proceedings shall be governed by Fed.R.App.P. 41(b). Otherwise, the mandate shall issue ten (10) days from the date of the filing of this opinion.
 
 
 62
 Affirmed.
 
 
 
 [1]
 All dates in this opinion are in 1986, unless otherwise indicated
 
 
 [2]
 For a scholarly analysis of the journalist's privilege as currently recognized by the federal courts, see generally, Note, A Press Privilege for the Worst of Times, 75 Geo.L.J. Vol. 1 (to be published Spring 1987)