**TITAN SPORTS, INC., a Delaware Corporation, Plaintiffs,**

v.

**TURNER BROADCASTING SYSTEMS, INC., World Championship Wrestling, Inc. and Eric Bischoff, Defendants.**

**Miscellaneous No. 96–681.**

United States District Court, W.D. Pennsylvania.

April 11, 1997.

George B. Foster, Jerry S. McDevitt, Kirkpatrick & Lockhart, Pittsburgh, PA.

David Dunn, John Houston Pope, Davis, Scott, Weber & Edwards, P.C., New York City, Mark R. Hornak, Patrick L. Abramowich, Buchanan Ingersoll, P.C., Pittsburgh, PA, for non-party respondent Mark Madden and defendant World Championship Wrestling, Inc.

## MEMORANDUM OPINION

LEE, District Judge.

Presently before the Court is the motion of Titan Sports, Inc. (Document No. 1) to enforce a subpoena and to compel disclosure of a non-party, Mark W. Madden, in Titan's action against Turner Broadcasting Systems, Inc. ("TBS"), World Championship Wres-

tling, Inc. ("WCW") and Eric Bischoff, filed in the United States District Court for the District of Connecticut, Civil No. 3:96CV01139. After careful review of Titan's motion to compel, the motion is GRANTED in part and DENIED in part.

Specifically, Titan seeks to discover the identity of individuals from TBS and the WCW who consulted with Mr. Madden in connection with Mr. Madden's reports disseminated on the TBS/WCW 900–number hotline. In addition, Titan generally seeks to discover information exchanged in consultations between Mr. Madden and individuals from TBS and WCW relating to allegedly false and defamatory statements disseminated on the 900–number hotline.

Relevant to the instant motion are defamation and libel claims asserted by Titan against TBS and the WCW. *First Amended Verified Complaint*, Count IX and X, October 31, 1996. In both defamation and libel claims, Titan alleges that Mr. Madden disseminated false information through the use of a 900–number hotline. Titan further alleges that statements made by Mr. Madden were made with a reckless disregard for the truth and with actual malice. *First Amended Verified Complaint*, ¶¶ 202, 217. Finally, Titan alleges that Mr. Madden's comments were "authorized, reviewed and approved by the WCW." *First Amended Verified Complaint*, ¶¶ 200, 215.

During the relevant time period, Mr. Madden worked as a wrestling commentator for TBS and WCW, recording his commentary for dissemination on the 900–number hotline. The WCW operates a 900–number hotline as a source for information and stories relating to its organization and to wrestling in general. Mr. Madden was one of several commentators on the WCW's 900–number hotline. He testified during his deposition that he received information from sources at the WCW and TBS for use in preparing his commentaries on the 900–number hotline. *Deposition of Mark W. Madden*, July 15, 1996, at 130–32, 135–36. In addition, Mr. Madden testified that he, "sometimes bounce[d] some ideas off WCW personnel." *Deposition of Mark W. Madden*, at 138. Mr. Madden would then develop a "script" for

dissemination on the 900–number hotline. Notably, Mr. Madden also testified that his commentaries were submitted for review to individuals employed by TBS and the WCW prior to airing. *Deposition of Mark W. Madden*, at 56. At times, WCW personnel edited the submitted commentary. After review of the script and any editorial changes were made, the commentary would be disseminated for the public through the 900–number hotline.

Mr. Madden was deposed in Pittsburgh, Pennsylvania on July 15, 1996. He invoked his journalist's privilege in response to questions by Titan's counsel regarding Mr. Madden's sources at the WCW and TBS. Although Mr. Madden was employed as an independent contractor by TBS and the WCW, he asserted his privilege based on a reporter-source relationship. Titan subsequently filed the instant motion to compel disclosure by Mr. Madden.

In support of its Motion, Titan asserts that (i) Mr. Madden cannot base his privilege on Pennsylvania's Shield Law; (ii) Mr. Madden does not qualify as a journalist entitled to invoke the journalist's privilege; and (iii) assuming that Mr. Madden is deemed to be a journalist, Titan is entitled to discover the relevant information despite Mr. Madden's assertion of the journalist's privilege.

## LEGAL DISCUSSION

### *The Federal Law of Privilege Applies*

■ During the course of his deposition, Mr. Madden asserted his privilege pursuant to Pennsylvania's Shield Law. 42 Pa.C.S. § 5942(a). Titan argues that if Mr. Madden is entitled to invoke any privilege, such privilege must be based on federal law and not the Pennsylvania Shield Law. The Court agrees that federal law is to be applied in this case.

In *von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987), the Court of Appeals for the Second Circuit decided a similar question of a non-party witness invoking the journalist's privilege. Before determining that issue, however, the *von Bulow* court inquired into whether state or federal

law governed the privilege. *von Bulow,* 811 F.2d at 141. Both state and federal claims were asserted by the plaintiff. Because the evidence sought from the alleged journalist related to both federal and state claims, the Court held that federal law controls. *Id.* In reaching its holding, the *von Bulow* court noted that the legislative history of Federal Rule of Evidence 501 supports the application of federal law. *Id.; see also Robinson v. Magovern,* 83 F.R.D. 79, 84–5 (W.D.Pa.1979).

Titan's claims against the Defendants include both federal and state law claims. The evidence Titan seeks from Mr. Madden concerns alleged false and defamatory statements attributed to the Defendants, and relates to Titan's claims, including defamation and trade libel, violation of the Lanham Act, and unfair competition in violation of Connecticut state law. Therefore, the Court finds that the federal law of privilege governs the question of Mr. Madden's assertion that the requested information is privileged. Accordingly, Federal Rule of Evidence 501[1] governs the issues concerning the privilege asserted by Mr. Madden.

### Mr. Madden Qualifies As A News Gatherer For Purposes of the Federal Rule of Privilege

■ Titan contends that Mr. Madden does not qualify as a "journalist" entitled to claim the qualified privilege. Specifically, Titan believes that Mr. Madden cannot qualify as a journalist in his capacity as a commentator for the 900–number hotline. Under the relevant law and the facts of this case, the Court finds that Mr. Madden qualifies as a journalist in his capacity as a 900–number commentator.

■ The Court of Appeals for the Second Circuit enunciated the leading test for determining whether a person qualifies as a journalist for purposes of the qualified federal privilege. *von Bulow,* 811 F.2d 136. "[T]he

individual claiming the privilege must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *von Bulow,* 811 F.2d at 144. The focus of the inquiry is on the intent of the one claiming the privilege, not on the medium used for dissemination: "The primary relationship between the one seeking to invoke the privilege and his sources must have as its basis the intent to disseminate the information to the public garnered from that relationship." *von Bulow,* 811 F.2d at 145. The Court finds *von Bulow* to be persuasive on this point.

■ Titan contends that the nature of the mode of dissemination used by Mr. Madden—the 900–number hotline—compels the conclusion that Mr. Madden is not a journalist. However, pursuant to the *von Bulow* test, a courts' inquiry focuses on the "intent to disseminate," and not the mode of dissemination. Although disseminating information through a 900–number hotline is not "traditionally associated with the institutionalized press," one using a non-traditional means of dissemination may seek to invoke the privilege. *von Bulow,* 811 F.2d at 144–45. The Court now turns to the question of whether Mr. Madden meets the *von Bulow* test.

Applying the intent-based test of *von Bulow,* the Court finds that Mr. Madden "sought, gathered, or received" materials from the WCW or TBS personnel or other sources with the intent to disseminate the information to the public, and such intent to disseminate to the public "existed at the inception of the newsgathering process." *von Bulow,* 811 F.2d at 144. Because Mr. Madden satisfies the *von Bulow* test for determining when a party is able to invoke the journalist's privilege, the Court finds that Mr. Madden is a news gatherer entitled to claim a qualified journalist's privilege under Federal Rule of Evidence 501.

---

1. Federal Rule of Evidence 501 provides in pertinent part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed.R.Evid. 501.

### The Application of the Privilege
### In The Instant Case

In libel actions, the right of a plaintiff to discover into the editorial process is a distinct issue from discovery of a journalist's confidential sources. Courts have generally protected discovery of confidential sources because of the effect disclosure of such sources would have on a journalist's conduct. "Disclosure of confidential sources is ... more onerous than inquiry into the editorial process in that it can significantly affect journalistic conduct." Marian E. Lindberg, Note, *Source Protection In Libel Suits After Herbert v. Lando*, 81 Colum. L.Rev. 338, 362 (1981). Furthermore, "compelled disclosure of confidential sources might chill the flow of information so essential to the freedom and effectiveness of the press." *Mize v. McGraw–Hill*, 86 F.R.D. 1, 4 (S.D.Tex.1980). This "chilling effect" on the free flow of information that discovery may have impinges on the public's interest in news dissemination in contravention of the First Amendment.

The balance between a plaintiff's need for disclosure of either confidential sources or the editorial process, and the public's First Amendment interest in the free flow of information was explained in *Mize*, decided shortly after the Supreme Court of the United States decision in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115, (1979):

> [T]he availability of the requested material through alternative discovery distinguishes the inquiry into the editorial process from the disclosure of a confidential source of information. Direct disclosure of the editorial process exposes the thoughts, considerations, and state of mind of editors and writers. At best, indirect evidence is a mere shadow of the editorial process. In contrast, the identity of a source of information may be ferreted out without direct disclosure by the press. Through vigorous discovery, a plaintiff may narrow down the field of possible sources and finally pinpoint the actual source. Where the plaintiff is aware of who knew about the transaction or event to which the allegedly libelous statement refers, his task of pinpointing the source is simplified. Thus,

the plaintiff's need for disclosure of confidential sources may be slighter than his need for compelled disclosure of the editorial process.

> At the same time, the publisher's and the public's interests in the confidentiality of sources surpasses their interest in the confidentiality of the editorial process. In *Herbert*, the Supreme Court explained that disclosure of the editorial process would aid in the free flow of information. It would have this effect because editors would decide against publishing material they knew to be false, if they anticipated that their conversations concerning the material might be disclosed in the course of a law suit. Since publication of false information would be discouraged, the public's interest in the free flow of truthful information would be served.

*Mize*, 86 F.R.D. at 3.

Accordingly, having determined that Mr. Madden is qualified to raise the journalist privilege, the Court considers first, whether Mr. Madden can refuse to reveal his confidential sources and second, whether he is privileged to protect Titan from discovering into the editorial process.

### Mr. Madden is Protected From Compelled
### Disclosure of His Confidential
### Sources

To overcome a journalist's qualified privilege invoked to protect the journalist's sources, the plaintiff must: (i) demonstrate that it has made an effort to obtain the desired information from other sources; (ii) demonstrate that the only access to the information sought is through the journalist and the journalist's sources; and (iii) persuade the court that the desired information is crucial to the claim. *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979); and *In re Williams*, 766 F.Supp. 358, 368 (W.D.Pa. 1991), *aff'd by an equally divided court en banc*, 963 F.2d 567 (3d Cir.1992).

Titan fails to meet the first and second criteria. Titan fails to meet the first criterion because it has not demonstrated that it has made an effort to obtain the information it seeks through other sources.

Titan fails to meet the second criterion because it has also failed to demonstrate that the only access to the information it seeks is available through Mr. Madden or his sources.

*Titan has failed to demonstrate that it has made an effort to obtain the desired information from other sources*

Titan has not deposed all of the employees of TBS and WCW that could provide the information it seeks. Titan asserts that it would not be practical to depose the over 100 employees of the WCW. At this stage of discovery, the Connecticut District Court has limited Titan to taking ten depositions, but for that, Titan acknowledges that it has the ability to depose WCW's employees. *Plaintiff's Reply Memorandum of Law In Support of Motion to Enforce Subpoena and Otherwise Compel Disclosure by A Non-Party,* at 14. Titan argues that because of the present deposition limitation, "the search for the sources is fruitless via depositions." *Id.* at 14–15.

Titan claims that it is impractical to depose such a large number of individuals. Titan also implies that because its depositions have been limited, Titan should be deemed to have met the first criterion, or, at a minimum, that the limitation on depositions presents a reasonable explanation for Titan failing to meet the first criterion. The Court disagrees.

Titan "cannot escape [its] obligation to exhaust alternative sources simply because [it] fear[s] that deposing [Defendant's] employees would be time-consuming, costly, and unproductive." *Zerilli v. Smith,* 656 F.2d 705, 715 (D.C.Cir.1981); *see also Lenhart v. Thomas,* 944 F.Supp. 525, 530 (S.D.Tex. 1996). "Courts should tread lightly whenever the First Amendment interests of news gatherers are implicated." *Williams,* 766 F.Supp. at 370–71. Because of the impor-

tance of First Amendment interests, Courts have required plaintiffs to make an effort to obtain the desired information from "other sources" before permitting the plaintiff to overcome the journalist's privilege. *See In re Roche,* 448 U.S. 1312, 101 S.Ct. 4, 65 L.Ed.2d 1103 (1980) (plaintiff required to depose individuals from among 65 witnesses held sufficient to stay compelling disclosure form journalist); *Zerilli,* 656 F.2d at 714; *Carey v. Hume,* 492 F.2d 631 (D.C.Cir.), *cert. denied,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974) (suggesting that taking of 60 depositions is reasonable prerequisite to compelling disclosure).[2] Moreover, Titan could obtain "the information sought from the applicant by other adequate—albeit somewhat roundabout—methods." *In re Roche,* 448 U.S. at 1316, 101 S.Ct. at 6.

Finally, Titan has not demonstrated, nor does it argue, either that the present limitation on the number of depositions is a permanent limitation or that Titan is unable to obtain the information it seeks under the present deposition limitation. Furthermore, the limitation may change as Titan has filed a request for permission to take additional depositions. *Plaintiff's Reply Memorandum of Law,* at 14 n. 3. Thus, because Titan has failed to make the necessary effort to obtain the desired information from other sources, Titan has failed to meet the first criterion.

*Titan has failed to demonstrate that the only access to the information sought is through Mr. Madden or his sources*

Implicit in Titan's admission that it has not exhausted "other sources," is Titan's acknowledgment that the information it seeks to compel from Mr. Madden may also be discovered through deposing other individuals. Titan has discovery mechanisms available to it to assist Titan in ferreting out the identities of Mr. Madden's confidential

**2.** The United States Supreme Court rejected creating Constitutional protection from burdensome discovery for media defendants in libel actions in *Herbert v. Lando,* 441 U.S. 153, 176, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979). The Supreme Court also noted that discovery costs and related burdens are subject to the requirements of Federal Rules of Civil Procedure 1 and 26(b)(1) & (c). *Id.* 441 U.S. at 177, 99 S.Ct. at 1649. To insure the "just, speedy, and inexpen-

sive determination" of an action, "the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense....'" Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." *Id.* (brackets in original)

sources without Mr. Madden directly disclosing those sources. *Mize,* 86 F.R.D. at 3. Thus, Titan fails to meet the second criterion. The Court therefore finds that Titan cannot compel Mr. Madden to disclose his confidential sources.

*Titan is Entitled To Discover Into the Editorial Process Relating To Mr. Madden's Commentaries On the 900–number Hotline*

In *New York Times v. Sullivan,* the Supreme Court of the United States held that in an action for libel by a public figure plaintiff, the plaintiff must prove actual malice in order to establish a violation. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, (1964). Subsequent decisions of the Supreme Court further define First Amendment protection afforded media defendants in defamation and libel actions. *See, e.g. Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, (1974); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, (1968); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, (1967). However, in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Supreme Court refused to construe First Amendment defamation jurisprudence so as to place discovery of the editorial processes beyond the reach of a public figure plaintiff.

The *Herbert* Court only considered discovery into the editorial process, the decision "does not address the issue of confidential sources...." Lindberg, *Source Protection in Libel Suits,* 81 Colum. L.Rev. at 357. In *Herbert,* the Supreme Court held that the First Amendment does not bar a plaintiff in a libel action from inquiring into the editorial processes of the defendants responsible for publishing the alleged false statements. In reaching its holding, the Supreme Court noted that "it is evident that the courts across the country have long been accepting evidence going to the editorial processes of the media without encountering constitutional objections." *Id.* 441 U.S. at 165 & n. 15, 99

S.Ct at 1643 & n. 15 (identifying "scores of libel cases" where evidence of the editorial process was admitted).[3] The Supreme Court has also recognized that its own decisions have implicitly permitted discovery going to the editorial process in libel cases. *Id.* 441 U.S. at 160–63 & n. 6, 99 S.Ct. at 1640–42 & n. 6.

The *Herbert* Court further recognized that barring a plaintiff from inquiring into the editorial process "would substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times, Butts,* and similar cases." *Id.* 441 U.S. at 169, 99 S.Ct. at 1644. "The plaintiff's burden is now considerably expanded. In every or almost every case, the plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability on the part of the publisher." *Id.* 441 U.S. at 176, 99 S.Ct. at 1648. Finally, in *Herbert,* the Supreme Court determined that permitting discovery into the editorial processes does not have a chilling or dampening effect on the free flow of information. *Id.* 441 U.S. at 171–74, 99 S.Ct. at 1646–48. Accordingly, the Supreme Court found that a plaintiff is not barred from inquiring "directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error." *Id.* 441 U.S. at 160, 99 S.Ct. at 1641.

█ Titan must establish actual malice on the part of the Defendants in order to succeed on its defamation and libel claims. Titan seeks to discover what the employees of the Defendants knew, said and decided with regard to the alleged libelous statements disseminated by Mr. Madden on the 900–number hotline. In other words, in order to establish the element of actual malice, Titan seeks to discover into the "state of mind of those who edit, produce, or publish, and into the editorial process." *Id.* 441 U.S. at 157, 99 S.Ct. at 1639. As stated above, Mr. Madden submitted his commentaries to WCW and TBS personnel for review and, at times, editing. Mr. Madden also discussed upcoming content of his commentaries with WCW

---

**3.** For example, in *Cook v. East Shore Newspapers,* 327 Ill.App. 559, 590, 64 N.E.2d 751, 765 (1945), a case cited by the *Herbert* Court, the *Cook* Court held that in determining the existence of malice "[a]ll circumstances surrounding the transaction are proper for consideration...."

and TBS personnel. In short, the professional relationship between Mr. Madden and personnel of the WCW and TBS consisted of the typical editorial process that occurs prior to dissemination of information to the public.

Therefore, consistent with the *Herbert* decision, the Court finds that Titan is not barred from inquiring into Mr. Madden's "thoughts, opinions, and conclusions" in connection with his commentaries on the 900–number hotline. *Id.* 441 U.S. at 170, 99 S.Ct. at 1646. Additionally, the Court finds that Mr. Madden's interactions between employees of the WCW and TBS relating to the 900–number hotline are part of the editorial process. Titan is also entitled to discover into the "internal communications" and "collegiate conversations or exchanges" that occurred between and among Mr. Madden and employees at the WCW and TBS. In sum, Titan is not barred from discovering "[a]ll circumstances surrounding the transaction" involving the alleged statements made on the 900 hotline. *Cook v. East Shore Newspapers*, 327 Ill.App. 559, 590, 64 N.E.2d 751, 765 (1945) (*cited with approval in Herbert*, 441 U.S. at 165 & n. 15, 99 S.Ct. at 1643 & n. 15).

### Conclusion

The Court concludes that Mr. Madden qualifies as a journalist and is entitled to invoke the journalist's privilege. The federal qualified journalist's privilege applies in this case. Even if Pennsylvania's Shield Law were to apply, it seems apparent that Titan would be able to inquire into the editorial process. Judge Becker, concurring in *Coughlin v. Westinghouse Broadcasting and Cable Inc.*, 780 F.2d 340, 344 n. 2 (3d Cir. 1985), *cert. denied*, 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986), recognized the distinction in Pennsylvania between discovery of confidential sources and discovery into the editorial process: "The [Pennsylvania] Shield Law protects only sources of information, not the thought or editorial processes of

reporters or news organizations."[4] As to the discovery of Mr. Madden's confidential sources, Titan has failed to overcome the journalist's privilege and is therefore prohibited from compelling disclosure of Mr. Madden's confidential sources. However, Titan is permitted to discover into the editorial processes that occurred among and between Mr. Madden and individuals from the WCW and TBS concerning the commentaries disseminated over the 900–number hotline.

Accordingly, Titan's Motion will be GRANTED in part and DENIED in part. An appropriate Order will be entered.

### ORDER

AND NOW, this 4th day of April, 1997, it is hereby **ORDERED** that the "Motion To Enforce Subpoena and Otherwise Compel Disclosure by a Non–Party" (Document No. 1) is **GRANTED** in part and **DENIED** in part as follows:

1. Plaintiff Titan Sports, Inc.'s motion is **DENIED** insofar as it requests disclosure of Mark W. Madden's confidential sources relating to the 900–number hotline.

2. Plaintiff Titan Sports, Inc.'s motion is **GRANTED** insofar as it requests disclosure into the editorial processes between and among Mark W. Madden and individuals at World Championship Wrestling, Inc. and Turner Broadcasting Systems, Inc. in connection with Mark W. Madden's commentaries disseminated on the 900–number hotline operated by World Championship Wrestling, Inc. and Turner Broadcasting Systems, Inc.; and in that regard, Titan Sports, Inc. is permitted to discover the identities of individuals involved in the editorial process in connection with Mark W. Madden's commentaries on the 900–number hotline.

---

**4.** In a case decided after *Coughlin*, the Pennsylvania Supreme Court held that the Shield Law did not protect from discovery unpublished information which would not reveal confidential sources. *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987). The

Pennsylvania Supreme Court relied on *Herbert*, noting that to construe the Shield Law to place unpublished information beyond the reach of a libel plaintiff, "even the *Herbert* Court's rare concession to the defamation plaintiff would be negated." *Id.* 516 Pa. at 191, 532 A.2d at 349.