J. A04011/16

2016 PA Super 125

DOMINICK D. DiPAOLO : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
TIMES PUBLISHING COMPANY, D/B/A :
ERIE TIMES NEWS, CYBERINK, LP, :
D/B/A GOERIE.COM, LISA THOMPSON, :
EDWARD PALATELLA JR., AND :
MICHAEL MACIAG, : No. 1713 WDA 2014
:
Appellants :


Appeal from the Order, October 10, 2014,
in the Court of Common Pleas of Erie County
Civil Division at No. 14004-2011


BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND SHOGAN, J.


OPINION BY FORD ELLIOTT, P.J.E.: **FILED JUNE 15, 2016**

Appellants, Times Publishing Company, d/b/a Erie Times News ("Times"); Cyberink, LP, d/b/a GoErie.com ("Cyberlink"); Lisa Thompson ("Thompson"); Edward Palatella Jr. ("Palatella"); and Michael Maciag ("Maciag") appeal from the October 10, 2014 order entered in the Court of Common Pleas that granted the motion to compel of appellee, Dominick D. DiPaolo ("Judge DiPaolo"). We affirm.

The record reflects that Judge DiPaolo, a magisterial district judge, filed a three-count complaint alleging libel with respect to a series of print and online articles and blogs published on November 14, 2010; November 28, 2010; April 16, 2011; and April 17, 2011. Times and

Cyberlink are business entities that publish the **Erie Times News** newspaper and GoErie.com, an online newspaper. These business entities employ the individual appellants Thompson, Palatella, and Maciag as reporters, journalists, writers, and/or bloggers.

The events that gave rise to this appeal took root on October 28, 2010, when the Office of the Pennsylvania Attorney General ("Attorney General") initiated an action against Unicredit America Incorporated ("Unicredit"), an Erie-based debt-collection company. The complaint alleged that Unicredit engaged in certain debt-collection activities that violated various Pennsylvania consumer-protection laws, as well as the Pennsylvania Rules of Civil Procedure. The Attorney General also averred that Unicredit improperly filed numerous civil actions in Judge DiPaolo's magisterial district office and then obtained judgments against most of the defendant debtors. The Attorney General further alleged that in an attempt to pressure the defendant debtors to satisfy judgments, Unicredit conducted fake post-judgment proceedings in a fake courtroom presided over by a fake judge.

Court proceedings in the Unicredit case took place before Erie County Court of Common Pleas Judge Michael E. Dunlavey on November 2, 2010 and November 10, 2010. Those proceedings resulted in significant press coverage, including articles published in the **Erie Times News** and on GoErie.com. It was the publication of those articles that caused

Judge DiPaolo to file his three-count defamation complaint, which he later amended, against the appellants.

Count I of Judge DiPaolo's amended complaint alleges libel against appellants Times, Cyberlink, Palatella, and Thompson for the following statements written by Palatella and Thompson and published by Times and Cyberlink in print and online on November 14, 2010:

> a. "Probe of Erie debt collector Unicredit widens;"
>
> b. "Federal agents, Dunlavey and even one of Unicredit's former clients have taken notice of the information surfacing in the case, which according to what Dunlavey said in court, could include a look at the practices in the office of Erie 6th Ward District Judge Dominick DiPaolo;" and
>
> c. "The chief counsel of the State Supreme Court's Judicial Conduct Board, Joseph J. Massa Jr., declined to comment on whether violations cited by Dunlavey would be investigated."

Amended complaint in civil action, 12/28/11 at 23-24, ¶¶ 137-138 (Docket #11).

Judge DiPaolo alleged that these statements harmed his reputation because they explicitly state or suggest that the Unicredit probe was widened to include Judge DiPaolo and that Judge Dunlavey had stated in court that Judge DiPaolo could and/or should be investigated for his role in that case by either Judge Dunlavey himself, the Attorney General's office, federal agents, or the Judicial Conduct Board. (*Id.* at 24, ¶ 139).

Judge DiPaolo further alleged that Judge Dunlavey never stated that Judge DiPaolo could, would, or should be the target of an investigation and that Judge Dunlavey only stated that he defended Judge DiPaolo's actions and that he believed that Judge DiPaolo's office had relied on Unicredit's representation. (*Id.* at 24, ¶ 140.)

Judge DiPaolo averred that the November 14, 2010 published statements were made with actual malice because (i) Thompson and/or Palatella attended the November 10, 2010 hearing and heard what Judge Dunlavey said; (ii) appellant Thompson and/or Palatella subsequently reviewed the November 10, 2010 hearing transcript and read what Judge Dunlavey said; (iii) a November 11, 2010 article written by Thompson accurately summarized the November 10, 2010 court proceeding; (iv) Thompson and/or Palatella admitted that they reviewed the Judicial Conduct Board's website and knew that that board investigates judges for alleged unethical or illegal conduct; (v) Thompson and/or Palatella reviewed the Unicredit case docket and knew no other hearing occurred after the November 10, 2010 proceeding and November 14, 2010, the date the article was published. (*Id.* at 25, ¶ 142(a)-(g).)

Count II of Judge DiPaolo's amended complaint alleges libel against Times, Cyberlink, Thompson, and Palatella for statements written by Thompson and Palatella and published by Times and Cyberlink in print and online on November 28, 2010, and then subsequently republished in articles

written by Thompson and Palatella and dated December 13, 2010;

December 21, 2010; December 22, 2010; and February 9, 2011.  The

following allegedly defamatory statements were published after a hearing

before Judge Dunlavey on Unicredit's motion for reconsideration for

post-trial relief on November 22, 2010:

> a.  the headline "Legal Ruling Questioned, Unicredit Lawyer:  Debt collector, judge not involved with Kickback;"
>
> b.  The statement that "Dunlavey said it appeared Unicredit established a 'ghost system of justice' by first obtaining judgment against debtors in the wrong venue – mainly Erie 6th Ward District Judge Dominick DiPaolo's office – and then using those judgments and sham court proceedings in Unicredit's offices to extract payments from debtors;" and
>
> c.  The unfair republication of [Unicredit's Attorney Krista] Ott's defamatory, but judicially privileged, statement that "there is a kickback scheme involving Unicredit and Magisterial District Judge DiPaolo's office" with additional sting caused by the aforesaid headline and statement.

*Id.* at 26-27, ¶ 146(a)-(c).

Judge DiPaolo alleged that these statements were defamatory because

they stated or suggested, and appellants' readers understood them to mean,

that Judge Dunlavey had issued a ruling that found Judge DiPaolo was

involved in a kickback scheme with Unicredit; that Judge Dunlavey said or

suggested that Judge DiPaolo was involved in Unicredit's "ghost system of

justice"; and that Judge DiPaolo was actually involved in a kickback scheme

with Unicredit. (*Id.* at 27, ¶ 148.) Judge DiPaolo further alleged that Judge Dunlavey never ruled, found, or otherwise stated or suggested that he believed that Judge DiPaolo was involved in a kickback scheme with Unicredit. (*Id.* at 27-28, ¶ 149.)

Judge DiPaolo averred that the November 28, 2010 published statements were made with actual malice because, among other things, Thompson and/or Palatella read and reviewed Judge Dunlavey's November 10, 2010 court order, as well as Attorney Ott's motion for reconsideration of that order, and one or both of those appellants had knowledge of the Unicredit case generally, so that they would have known that the statements published in the November 28, 2010 article were false.

Finally, Count III of Judge DiPaolo's amended complaint alleges libel against Times, Cyberlink, Thompson, Palatella, and Maciag for approximately 32 statements written by Thompson and Palatella and published by Times and Cyberlink in print and online on April 16, 2011 and April 17, 2011,[1] that harmed Judge DiPaolo's reputation because they stated or suggested, and their readers understood them to mean:

> a. That Judge DiPaolo had intentionally captioned those Unicredit cases that he heard to conceal that the creditors and/or debtors in those cases were out of his jurisdiction;

---

[1] These statements were also alleged to have been published on an April 16, 2011 blog post and on Unicredit's web page. (Amended complaint in civil action, 12/28/11 at 29, ¶ 155 (Docket #11).)

b. That Judge DiPaolo improperly heard cases in which his relatives were a party;

c. That Judge DiPaolo had extended judicial favors to Unicredit based on an attenuated familial relationship;

d. That Judge DiPaolo applied practices in his office that differed from other Magisterial District Judges in an improper effort to help Unicredit;

e. That a Judge had stated that "DiPaolo takes relatives['] cases;"

f. That a Judge or the Attorney General had called Judge DiPaolo's practices "unconscionable;" and

g. That Judge DiPaolo had knowledge of a jurisdictional deficit in the Unicredit-related cases filed in his office, that he had a duty to raise that jurisdictional deficit, and that he did not do so because he was related to one of Unicredit's principals.

*Id.* at 30, ¶ 157.

Judge DiPaolo alleged that Thompson, Palatella, and/or Maciag intentionally misquoted and/or mischaracterized the proceedings and public records upon which they based these statements and, therefore, made the statements with actual malice. (*Id.* at ¶¶ 158-159.)

During discovery in this case, Judge DiPaolo served interrogatories and requests for production on appellants. With respect to each alleged defamatory publication, Judge DiPaolo requested that appellants "[i]dentify each and every source who provided content used in the article and describe

the information provided by each source;" "[i]dentify and provide every note or set of notes reflecting the conversation had between the source identified [] and the person with whom that source spoke;" and "[i]dentify and provide any documents referred to in creating the article and state for what content within the document, if any, relied upon that document in whole or in part." (Motion to compel, 4/10/14 Exhibit A (Docket #37).) Appellants objected to these specific interrogatories and requests for production on the basis of privilege under the Pennsylvania Shield Law[2] and/or the qualified First Amendment privilege, also known as the journalist's privilege. Thereafter, Judge DiPaolo filed his first motion to compel contending, among other things, that he requested appellants' notes, unpublished drafts, and

---

[2]    **§ 5942. Confidential communications to news reporters**.

**(a)    General rule. --**

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S.A. § 5942.

documents referred to in creating the articles "because those notes, drafts, and documents are likely to provide insight into the state of knowledge of the reporters prior to their writing the [a]rticles and the mindset of the reporters in their writing the [a]rticles." (*Id.* at 5, ¶ 25.) Judge DiPaolo further averred that he "requires this information to meet the actual malice standard of liability required by the United States Constitution." (*Id.* at ¶ 26.) At oral argument on the motion, Judge DiPaolo agreed to narrowly tailor his discovery requests so that appellants could determine the applicability of the Shield Law and/or the qualified First Amendment privilege.

Subsequently, Judge DiPaolo sent a second set of interrogatories and requests for production to appellants. In response to those interrogatories, appellants identified notes of appellant Thompson.[3] Additionally, during Palatella's deposition, Palatella testified as to the existence of a spreadsheet that he prepared with appellant Maciag that compiled data from public court records to determine the identity and/or number of debtors sued by Unicredit who did not live within Judge DiPaolo's magisterial district. Thereafter, Judge DiPaolo filed a second motion to compel production of

---

[3] Appellants did not produce appellant Thompson's notes because, they contend, Judge DiPaolo did not request them in his second set of interrogatories and requests for production of documents and DiPaolo did not establish facts necessary to overcome the journalist's privilege. (Defendants' response in opposition to plaintiff's motion to compel, 7/28/14 at 3, ¶¶ 12-13 (Docket #49).)

appellants' notes, unpublished drafts, and documents referred to in creating the articles subject to redaction of confidential informants and a privilege log. The request necessarily includes the notes Thompson took at the November 10, 2010 hearing, as well the spreadsheet prepared by Palatella and Maciag. The trial court granted Judge DiPaolo's motion. This appeal followed.

Appellants raise two issues for our review:

> A. WHETHER THE TRIAL COURT ERRED IN FINDING THAT, WITH RESPECT TO THE NOTES PREPARED BY APPELLANT, THOMPSON, APPELLEE HAD MADE A SHOWING SUFFICIENT TO OVERCOME THE JOURNALIST'S PRIVILEGE UNDER THE FIRST AMENDMENT?

> B. WHETHER THE TRIAL COURT ERRED IN FINDING THAT, WITH RESPECT TO THE REPORTERS' RESOURCE MATERIALS AND SPREADSHEET, APPELLEE MADE A SHOWING SUFFICIENT TO OVERCOME THE JOURNALIST'S PRIVILEGE UNDER THE FIRST AMENDMENT?

Appellants' brief at 2-3.

Preliminarily, we note that the order granting Judge DiPaolo's motion to compel is appealable as a collateral order.

> [I]n general, discovery orders are not final, and are therefore unappealable. However, discovery orders involving privileged material are nevertheless appealable as collateral to the principal action pursuant to Pa.R.A.P. 313 ("Collateral Orders"). Rule 313(a) states that "[a]n appeal may be taken as of right from a collateral order of [a] . . . lower court."

> A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.
>
> Pa.R.A.P. 313(b).  A discovery order is collateral only when it is separate and distinct from the underlying cause of action.
>
> Generally, discovery orders involving purportedly privileged material are appealable because if immediate appellate review is not granted, the disclosure of documents cannot be undone and subsequent appellate review would be rendered moot.

*Rhodes v. USAA Casualty*, 21 A.3d 1253, 1258 (Pa.Super. 2011), *appeal denied*, 119 A.3d 351 (Pa. 2015) (internal case law citations and quotation marks omitted).

Accordingly, we will review the trial court's order granting Judge DiPaolo's motion to compel.  *See id.*, quoting *Berkeyheiser v. A-Plus Investigations, Inc.*, 936 A.2d 1117, 1123-1124 (Pa.Super. 2007) ("Pennsylvania courts have held that discovery orders involving potentially confidential and privileged materials are immediately appealable as collateral to the principal action.").

Generally, when reviewing the propriety of a discovery order, our standard of review is whether the trial court abused its discretion.  *Rhodes*, 21 A.3d at 1258 (citations omitted).  To the extent that we are presented with questions of law, our scope of review is plenary.  *Id.*

The discovery order at issue compels the media appellants to produce documents in Judge DiPaolo's defamation suit against them.

> "Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her." ***Elia v. Erie Insurance Exchange***, 430 Pa.Super. 384, 634 A.2d 657, 660 (1993).  Only statements of fact, not expressions of opinion, can support an action in defamation.  ***Id.***  In a defamation case, a plaintiff must prove:  "(1) The defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." ***Porter v. Joy Realty, Inc.***, 872 A.2d 846, 849 n. 6 (Pa.Super. 2005), quoting, 42 Pa.C.S.A. § 8343(a). ***See also, Weber v. Lancaster Newspapers, Inc.***, 878 A.2d 63 (Pa.Super. 2005).

***Moore v. Cobb-Nettleton***, 889 A.2d 1262, 1267 (Pa.Super. 2005).

Here, no dispute exists that Judge DiPaolo, as a magistrate, is a public official or a public figure.

> [T]he appropriate standard of fault depends on whether the plaintiff is a public or private figure.  If the plaintiff is a public official or public figure, and the statement relates to a matter of public concern, then to satisfy First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement with actual malice. In contrast, states are free to allow a private-figure plaintiff to recover by establishing that the defendant acted negligently rather than maliciously.

***American Future Systems, Inc. v. Better Business Bureau of Eastern***

***Pennsylvania***, 923 A.2d 389, 400 (Pa. 2007), ***cert. denied***, 552 U.S. 1076

(2007) (citations and parentheticals omitted).

> The term "actual malice" (sometimes shortened to "malice") is a term of art that refers to a speaker's knowledge that his statement is false, or his reckless disregard as to its truth or falsity. Thus, it implies at a minimum that the speaker "'entertained serious doubts about the truth of his publication,' . . . or acted with a 'high degree of awareness of . . . probable falsity.'" ***Masson v. New Yorker Magazine***, 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (quoting ***St. Amant v. Thompson***, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); ***Garrison v. Louisiana***, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). This term "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." ***Id.***

***American Future Systems, Inc.*** 923 A.2d at 395 n.6.

Here, appellants contend that the trial court erred in ordering compelled disclosure of Thompson's notes and the resource materials used and spreadsheet prepared by Palatella and Maciag because Judge DiPaolo did not overcome the journalist's privilege (also known as the qualified First Amendment privilege) under the First Amendment of the United States Constitution. We note that despite claiming the potential applicability of the Pennsylvania Shield Law, 42 Pa.C.S.A. § 5942(a), to these documents in the proceedings below, appellants advance no such argument on appeal. We further note that the shield law, unlike the journalist's privilege, is an absolute privilege that protects a journalist from compelled disclosure of a

confidential source. In interpreting the shield law, our supreme court has held that a plaintiff may discover unpublished documentary information gathered by the media to the extent that that documentary information does not reveal the identity of a confidential source. **Hatchard v. Westinghouse Broadcasting Co.**, 532 A.2d 346, 351 (Pa. 1987). The purpose of the shield law is to maintain a free flow of information to the news media. **Id.**

Likewise, the reporter's privilege was designed to protect freedom of the press by insuring the free flow of information to reporters. **Davis v. Glanton**, 705 A.2d 879, 885 (Pa.Super. 1997) (citation omitted). Thus, there exists a stark distinction between the need for disclosure of materials that identify or could lead to the identification of confidential sources from the need for disclosure of materials created during the editorial process. The following aptly examines the dichotomy:

> In libel actions, the right of a plaintiff to discover into the editorial process is a distinct issue from discovery of a journalist's confidential sources. Courts have generally protected discovery of confidential sources because of the effect disclosure of such sources would have on a journalist's conduct. "Disclosure of confidential sources is . . . more onerous than inquiry into the editorial process in that it can significantly affect journalistic conduct." Marian E. Lindberg, Note, **Source Protection In Libel Suits After Herbert v. Lando**, 81 Colum. L. Rev. 338, 362 (1981). Furthermore, "compelled disclosure of confidential sources might chill the flow of information so essential to the freedom and effectiveness of the press." **Mize v. McGraw-Hill**, 86 F.R.D. 1, 4 (S.D. Tex. 1980). This "chilling effect"

- 14 -

on the free flow of information that discovery may have impinges on the public's interest in news dissemination in contravention of the First Amendment.

The balance between a plaintiff's need for disclosure of either confidential sources or the editorial process, and the public's First Amendment interest in the free flow of information was explained in *Mize*, decided shortly after the Supreme Court of the United States decision in *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115, (1979):

> The availability of the requested material through alternative discovery distinguishes the inquiry into the editorial process from the disclosure of a confidential source of information. Direct disclosure of the editorial process exposes the thoughts, considerations, and state of mind of editors and writers. At best, indirect evidence is a mere shadow of the editorial process. In contrast, the identity of a source of information may be ferreted out without direct disclosure by the press. Through vigorous discovery, a plaintiff may narrow down the field of possible sources and finally pinpoint the actual source. Where the plaintiff is aware of who knew about the transaction or event to which the allegedly libelous statement refers, his task of pinpointing the source is simplified. Thus, the plaintiff's need for disclosure of confidential sources may be slighter than his need for compelled disclosure of the editorial process.
>
> At the same time, the publisher's and the public's interests in the confidentiality of sources surpasses their interest in the confidentiality of the editorial process. In *Herbert*, the Supreme Court explained that disclosure of the editorial

> process would aid in the free flow of information. It would have this effect because editors would decide against publishing material they knew to be false, if they anticipated that their conversations concerning the material might be disclosed in the course of a law suit. Since publication of false information would be discouraged, the public's interest in the free flow of truthful information would be served.

*Mize*, 86 F.R.D. at 3.

*Titan Sports, Inc. v. Turner Broadcasting Systems, Inc. (In re Madden)*, 967 F.Supp. 142, 146 (W.D.Pa. 1997), *rev'd and remanded on other grounds*, 151 F.3d 125 (3d Cir. 1998). *See also Hatchard*, 532 A.2d at 349 (recognizing that the First Amendment does not bar a plaintiff from inquiring into the editorial processes of the media defendant responsible for publishing a defamatory statement because the plaintiff is entitled to discover information that permits a meaningful inquiry into whether the statement was made maliciously or recklessly).

In order to overcome the reporter's privilege, the movant must demonstrate (1) that the information sought is material, relevant, and necessary; (2) a strong showing that the information cannot be obtained by alternative means; and (3) that the information is crucial to the movant's case. *Riley v. City of Chester*, 612 F.2d 708, 716-717 (3d Cir. 1979).

Here, Judge DiPaolo does not seek disclosure of a confidential source or materials that could lead to the identity of a confidential source; rather,

he seeks disclosure of documents related to the editorial process that he contends he needs in order to prove actual malice in his defamation action.

Preliminarily, we note that prohibiting disclosure of the information sought by Judge DiPaolo would not further the goal of the reporter's privilege, which is to insure the free flow of information to reporters, because this case does not involve a confidential source who provided information to appellants. To the contrary, appellants created the information sought during their own editorial process in connection with writing and publishing the articles that are at the heart of Judge DiPaolo's defamation action against them. As a result, compelled disclosure would not result in a chilling effect because it would have no impact on any future confidential source's decision to provide information to a reporter.

Additionally, the information sought goes to Thompson's, Palatella's, and Maciag's states of mind. Because Judge DiPaolo must prove actual malice in his defamation action against appellants, Thompson's notes and the resource materials used and the spreadsheet created by Palatella and Maciag during the editorial process are material, relevant, necessary, and crucial to Judge DiPaolo's defamation case against them.

Finally, this information cannot be obtained by alternative means. Thompson's notes constitute her personal record of the Unicredit case based on her experience and perception. As a result, Thompson's personal record cannot be obtained from anyone other than Thompson. Likewise, the

resource materials and spreadsheet compilation are personal to Palatella and Maciag because they chose what debtors' cases to include and what methodology to employ in their analysis in order to ascertain their own meaning of the data. Consequently, the resource materials and spreadsheet cannot be obtained from anyone other than Palatella and Maciag.

We, therefore, find no abuse of discretion in the trial court's finding that Judge DiPaolo overcame the reporter's privilege and its resulting order granting Judge DiPaolo's motion to compel.

Order affirmed.

Bender, P.J.E. joins the Opinion

Shogan, J. files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/15/2016