J-A11019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PHILIP GODLEWSKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CHRIS KELLY, TIMES SHAMROCK | : | No. 1440 MDA 2024 |
| COMMUNICATIONS, SCRANTON | : | |
| TIMES, LP AND LARRY HOLEVA | : | |

Appeal from the Order Entered September 3, 2024
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2021-CV-2195

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM PER CURIAM:                    **FILED: SEPTEMBER 15, 2025**

Appellant, Philip Godlewski, appeals from the order entered in the Lackawanna County Court of Common Pleas, granting summary judgment in favor of Appellees, Chris Kelly ("Kelly") and the Scranton Times, LP ("Scranton Times").  We affirm.

The relevant facts and procedural history of this case are as follows. Appellant initiated this action asserting claims of defamation and false light invasion of privacy against Appellees[1] based on a column entitled "QAnon

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant originally sued Kelly, Times-Shamrock Communications, the Scranton Times-Tribune, and the executive editor of the Scranton Times, Larry Holeva.  On January 2, 2024, Appellant stipulated to the dismissal of Times-
*(Footnote Continued Next Page)*

Realtor sells rabbit holes on YouTube," authored by opinion-editorial ("op-ed") columnist Kelly and published by the Scranton Times on February 14, 2021. (Trial Court Opinion, dated 8/30/24, at 2-3). In the column, which the trial court quotes in its entirety, (**see id.** at 3-7), Kelly stated, *inter alia*, that Appellant had previously pled guilty in Lackawanna County to corruption of a minor resulting from a sexual relationship with a 15-year-old student while he was a 27-year-old baseball coach at her school. ***See Commonwealth v. Godlewski***, No. 10 CR 2613, (Lacka. Co.) ("Case No. 10 CR 2613"). As stated by the trial court:

> [Appellant] contends in his verified Complaint that the … article contained three defamatory characterizations regarding him. First, he maintains that Kelly and the Scranton Times falsely accused "[Appellant] of having a sexual relationship with a 15-year-old pursuant to a criminal matter which occurred in 2011," even though "he never had sex [with] an underage girl" and "pled to a misdemeanor." He avers that "Kelly deliberately conflated the charges against [Appellant] of having sex with a girl, with his plea to a misdemeanor charge for corruption of minors," and claims that "[t]here is nothing in [Appellant's] criminal record which indicates, relates and/or references to [Appellant] pleading guilty to having had sex with a 15-year-old girl, or any other underage girl."
>
> Second, [Appellant] alleges that by stating that "[Appellant] was selling rabbit holes on YouTube, coupled with the cartoon of a real estate sign on top of which was written 'RABBIT HOLE FOR SALE!' and beneath the words "UNREAL-TOR" and next to a "diagram in the center of the sign that represents QAnon," Kelly and the Scranton Times

---

Shamrock Communications and The Scranton Times-Tribune and the substitution of the Scranton Times in their stead, and to the voluntary dismissal of Larry Holeva as a party.

"gratuitously, maliciously, unnecessarily, and inextricably linked [Appellant's] professional integrity to his alleged political views using the latter to impugn his integrity as a realtor.[2] He asserts that he "made his reputation as a realtor by being trustworthy, reliable, and knowledgeable" and "discharging the highest ethical standards," but "was terminated [by ERA One Source Realty] because of the defamatory article written and published by" Kelly and the Scranton Times.[3] [Appellant] submits that he "has been defamed in his profession as a realtor in which he functions as a private individual," and that he "remains a private figure with respect to criminal charges which were brought against him and any plea agreement does not transform him into a public figure in that respect."[4]

[2] QAnon has been described in other litigation as "an American conspiracy movement" that "centers around 'Q,' who is supposedly 'a high-ranking government official' who 'leaks top secret information' about the 'Deep State.'" It believes that a secret global cabal of Democrats and celebrities worship Satan, sexually abuse children, and drink the children's blood to ingest a life-extending chemical called adrenochrome. QAnon is considered to be "the progeny of PizzaGate– the theory that high-ranking Democratic officials were running a child-sex ring out of a Comet Ping Pong, a pizza parlor in Washington D.C."

QAnon proponents believe "that … President Trump was 'recruited by top military generals to run for President in 2016 to break up' the cabal, disrupt its control over world affairs, and 'bring its members to justice.'" They similarly "believe, without evidence, that President Trump was elected to defeat a purported cabal of cannibalistic pedophiles in the government." QAnon supporters also "claim that organizations funded by the Bill and Melinda Gates Foundation engineered, patented, and weaponized the novel coronavirus (COVID-19) to undermine … President Trump's chances of re-election in 2020."

[3] [Appellant's] now ex-wife, Dorothea (Dori) Gallagher, testified that [Appellant's] employer at ERA One Source Realty, Ms. Sunita Arora, instructed

> [Appellant] to discontinue his QAnon social media videos and informed him that "it wasn't something that she could have in her business."
>
> 4 However, by Order dated January 18, 2023, Judge James A. Gibbons approved the parties' stipulation in which [Appellant] specifically agrees "that for purposes of this litigation, plaintiff, Philip Godlewski, shall be deemed a public figure."
>
> Third, [Appellant] alleges that Kelly and the Scranton Times defamed him by referring to him as "a purveyor of poison" despite "not having one wit of evidence that [Appellant's] views and opinions have irreparably damaged anyone. He contends that "despite stating that [Appellant] was not at the Capitol on January 6, 2021, the date of the insurgency," Kelly and the Scranton Times "tab [Appellant] as, not only a supporter, but an active participant and organizer" who was "integrally involved in the unlawful assault on the Capitol and is part of a conspiracy to overthrow the United States government by force and is thus a 'seditionist.'" [Appellant] submits that by implying that he was "an integral part of the Capitol insurgency, the article labels [Appellant], not just as a seditionist insurgent and a traitor to his country, but also a murderer, complicit in the [deaths] of five persons."

(Trial Court Opinion at 7-9) (record and internal citations omitted).

Upon completion of discovery, Appellees filed a motion for summary judgment asserting that Appellant had failed to adduce sufficient evidence to satisfy his burden of proof as a public figure[2] for his defamation and false light claims. Specifically, Appellees argued that Appellant cannot establish that any factual statements concerning him in the article are false, and that any other

---

[2] On January 18, 2023, the trial court approved the parties' stipulation in which Appellant agreed that "for purposes of this litigation, by virtue of his large following, [Appellant] is a public figure." (Trial Court Order, dated 1/18/23).

non-factual content in the article constitutes either parody or Kelly's opinions and are not actionable. Appellees further claimed that they were entitled to judgment as a matter of law because Appellant cannot prove that any allegedly false statement was published with actual malice, or that Appellees either knew that statements were false or acted with reckless disregard as to whether they were true or false. In support of the motion, Appellees submitted numerous exhibits, including depositions from Appellant and Kelly among others, and affidavits from Brienna DuBorgel,[3] the minor Appellant was charged with sexual offenses against, and the Assistant District Attorney associated with that case, Patricia Lafferty.

In her affidavit, Ms. DuBorgel informed detectives that she had been in a sexual relationship with Appellant when she was a high school student and he was the baseball coach at the high school.

> The summary judgment record reflects that on July 9, 2020, Detective Michele Mancuso and Detective Justin Leri filed an Affidavit of Probable Cause seeking the filing of criminal charges against [Appellant] based upon his unlawful sexual activity with a minor, [Ms.] DuBorgel. ***Commonwealth v. Godlewski*** …, No. 10 CR 2613, (Lacka. Co.). Ms. DuBorgel informed Detective Mancuso that "she had been involved in

---

[3] Although in criminal prosecution involving sexual abuse of a minor, the name of the minor is not to be disclosed, in this case, the victim voluntarily identified herself and provided affidavits attesting to the sexual offenses she asserted against Appellant in Case No. 10 CR 2613. Appellant identified Ms. DuBorgel by name in a civil action he initiated against her based on her affidavits in this case, and Ms. DuBorgel filed a counterclaim in that action asserting claims against Appellant for defamation, false light, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress based upon the same charges asserted in Case No. 10 CR 2613.

a sexual relationship with [Appellant] ... while he was the baseball coach at Riverside High School in 2008" when she was 14 years old and a 9th grade student at Riverside High School. She further "stated they were involved in oral and vaginal sexual intercourse" which "started happening in his vehicle" in 2008.

Ms. DuBorgel advised Detective Mancuso on July 7, 2010, that [Appellant] "has been contacting her while he was at work" as a realtor, and that "she has been keeping in contact with [Appellant] through a throw away phone he keeps with him while at work." After "the cell phones and computers" of [Appellant] were seized and subject to forensic analysis "by Corporal Derek Fozard of the Pennsylvania State Police and Detective Justin Leri of the Lackawanna County [District Attorney's] Office," the investigators ascertained that the text messages between [Appellant] and Ms. DuBorgel "contained conversations of sexual encounters, exchanges of gifts, and a brand-new vehicle for the victim." Specifically, Corporal Fozard and Detective Leri were able to verify and authenticate the following text messages transmitted from [Appellant] to Ms. DuBorgel:

> 2/25/10: "I just want you to see that I really care about you, and not your body or our sex. Maybe that's the only way I can."

> 2/28/10: "The only way we'd ever be sexually satisfied is if we did it like 4-5 times a day."

> 3/6/10: "I hate my penis, idk [I don't know] why the fuck that happens. You looked so good and were giving incredible head then BOOM, gone. Like wtf.

> [Appellant's] 2 Page Day Log:

> 10:14 a.m.: "Realized that you're only 15, but quickly stopped caring."

> 11:39 a.m.: "I just pulled [your] hair from my crotch area. hahahaha!!!"

> 02:56 p.m.: "Should we get a Jacuzzi suite? Hmm"

(Trial Court Opinion at 11-13) (footnote and record citations omitted).

The Commonwealth filed a criminal complaint in Case No. 10 CR 2631 on July 9, 2020, accusing Appellant of numerous sexual offenses against a minor. Following plea negotiations, the Commonwealth filed an amended criminal information on November 8, 2010, charging Appellant with a single count of corruption of minors, 18 Pa.C.S.A. § 6301(a)(1), on the factual basis that he "'did repeatedly have inappropriate text [m]essages and contact with a minor.'" (*Id.* at 13-14) (footnote omitted). On July 11, 2011, Appellant pled guilty to corruption of a minor and was sentenced to 3 to 23 months of home confinement and prohibited from having any contact with Ms. DuBorgel during his supervision.[4]

The court conducted oral argument on Appellees' motion for summary judgment on August 19, 2024. At argument, Appellees explained that because Appellant brought the action against a media defendant, he bore the burden of proving that the publications were false and were published with

_____

[4] The record also reflects that on February 20, 2020, Appellant was charged with forgery of bank records, theft by deception, tampering with records, and bad checks. *Commonwealth v. Godlewski*, No. 20 CR 664 (Lacka. Co.) ("Case No. 20 CR 664"). On February 23, 2021, Appellant pled guilty to tampering with records and bad checks, admitting that he provided a fraudulent bank statement and unlawfully passed a check for payment in the amount of $21,789.84 knowing that it would not be honored by the drawee. (Trial Court Opinion at 19). Following his arrest in Case No. 20 CR 664, the state real estate commission suspended Appellant's realtor's license. (*Id.* at 19 n.12).

actual malice. Appellees claimed that the evidence produced by Appellant failed to meet his burden to prove that Appellees made false statements about Appellant in the article. Specifically, Appellees argued that Appellant cannot as a matter of law prove that the statements regarding Appellant having sex with a minor were false, especially given his guilty plea in Case No. 10 CR 2613, where he pled guilty to corruption of minors; nor could Appellant meet his burden of proving that the complained of statement was published with actual malice. Appellees further argued that the statements in the article about QAnon and Appellant as a purveyor of poison, were Kelly's opinions and could not form the basis of a defamation action. Finally, Appellees argued that the cartoon was a parody based on Appellant's job as a realtor and his broadcasting QAnon conspiracies.

On August 30, 2024, the trial court entered an order granting Appellees' motion for summary judgment. The court docketed an order on September 3, 2024, directing that judgment be entered in favor of Appellees. On September 13, 2024, Appellant filed a timely motion for reconsideration, alleging that the trial court erred in its conclusion that the record lacks clear and convincing evidence that Appellees knew that the statements were false or entertained serious doubts about the truth of the publication. Appellant also challenged the court's observation that the deposition testimony of the Scranton Times' editor, Lawrence Holeva, was difficult to decipher due to extensive redactions. Appellant stated that counsel had highlighted the

deposition and that the highlighting appeared as redactions in the reproduced copies; hence, he provided the court with a clear copy of the deposition of Mr. Holeva and requested that the court reconsider its decision.

On September 30, 2024, the trial court issued an opinion denying the motion for reconsideration. The court explained that Appellant was bound by the statements made during his guilty plea colloquy and that, even considering the unobscured deposition transcript, Appellant failed to adduce sufficient evidence of actual malice necessary to support his claims. Thus, the court stated that it appropriately considered the evidence and text messages from his guilty plea at Case No. 10 CR 2613, and denied Appellant's motion for reconsideration. This timely appeal followed.

Appellant raises two issues on appeal:

> I. Whether the trial court erred in granting [Appellees'] motion for summary judgment as to [Appellant's] defamation claims[?]
>
> II. Whether the trial court erred in granting [Appellees'] motion for summary judgment as to [Appellant's] false light invasion of privacy claim[?]

(Appellant's Brief at 4).

Our standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law. *Mee v. Safeco Ins. Co. of America*, 908 A.2d 344, 347 (Pa.Super. 2006).

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing

and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hospital*, 753 A.2d 829, 832 (Pa.Super. 2000) (internal citations and quotation marks omitted). Our scope of review is plenary. *Pappas v. Asbel*, 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001), *cert. denied*, 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002). In reviewing a trial court's grant of summary judgment:

> [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.
>
> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [a] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to

- 10 -

make out a *prima facie* cause of action or defense.

Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

***Chenot v. A.P. Green Services, Inc.***, 895 A.2d 55, 61 (Pa.Super. 2006)

(internal citations and quotation marks omitted).

The function of the summary judgment proceedings is to avoid a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions. That trial by testimonial affidavit is prohibited cannot be emphasized too strongly. In considering a motion for summary judgment, the lower court must examine the whole record, including the pleadings, any depositions, any answers to interrogatories, admissions of record, if any, and any affidavits filed by the parties.

***DeArmitt v. New York Life Ins. Co.***, 73 A.3d 578, 595 (Pa.Super. 2013)

(quoting ***Penn Center House, In.v. Hoffman***, 520 Pa. 171, 175-76, 553

A.2d 900, 902-03 (1989)). "In determining the existence or non-existence of

a genuine issue of a material fact, courts are bound to adhere to the rule of

[***Borough of Nanty–Glo v. American Surety Co. of New York***, 309 Pa.

236, 163 A. 523 (1932),] which holds that a court may not summarily enter

a judgment where the evidence depends upon oral testimony." ***Id.*** "The

***Nanty–Glo*** rule means 'the party moving for summary judgment may not

rely solely upon its own testimonial affidavits or depositions, or those of its

witnesses, to establish the non-existence of genuine issues of material fact.'"

***Id.*** (quoting ***Dudley v. USX Corp.***, 606 A.2d 916, 918 (Pa.Super. 1992),

*appeal denied*, 532 Pa. 663, 616 A.2d 985 (1992)).

In his first issue, Appellant claims that the trial court erred when it

- 11 -

granted summary judgment in favor of Appellees on the cause of action for defamation. Appellant's issue contains multiple sub-parts which we must consider individually. In the first sub-part, Appellant asserts that the court erred in finding that he failed to adduce sufficient evidence of the falsehood of the statements. Appellant argues that the court erred by relying on the doctrine of collateral estoppel when it found that Appellant was bound by the statements he made during his guilty plea at Case No. 10 CR 2613. Appellant submits that pursuant to **Nanty-Glo, supra**, the court's summary judgment determination could not rely on the affidavit of probable cause for Case No. 10 CR 2613. Appellant claims that the court erred in taking judicial notice of the facts alleged in the affidavit of probable cause in that case and suggests that because he denied those facts, they did not form the basis for his plea. (**See** Appellant's Brief at 15, 36). Appellant insists that the trial court was only able to consider that he pled guilty to a corruption of minors charge as evidenced by the criminal information and guilty plea colloquy at Case No. 10 CR 2613. Accordingly, Appellant concludes the court erred in considering this evidence and in deciding that there was no genuine issue of material fact regarding the falsity of the statements at issue. We disagree.

To establish a cause of action for defamation, the plaintiff has the burden of proof regarding the following elements:

> (1) The defamatory character of the communication.

> (2) Its publication by the defendant.

- 12 -

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

*Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 191 (Pa.Super. 2003), *appeal denied*, 577 Pa. 690, 844 A.2d 553 (2004) (citing 42 Pa.C.S.A. § 8343). "If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Id.* Under Pennsylvania law, falsity is a critical element of a defamation claim. "To prevail on their defamation claim, [plaintiffs], as public figures, must prove, by clear and convincing evidence that the allegedly defamatory statements were false and that [defendant]-newspapers either knew they were false or recklessly disregarded their falsity." *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 621, 848 A.2d 113, 127-28 (2004).

"Whether a communication can be construed to have a defamatory meaning is a question of law for the court to determine." *Cashdollar v. Mercy Hosp. of Pittsburgh*, 595 A.2d 70, 75 (Pa.Super. 1991) (citation omitted). A communication is considered to be defamatory,

- 13 -

if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession. Additionally, the court should consider the effect the statement would fairly produce, or the impression it would naturally engender, in the minds of average persons among whom it is intended to circulate.

**Constantino v. University of Pittsburgh**, 766 A.2d 1265, 1270 (Pa.Super. 2001) (citations and internal quotation marks omitted).

Furthermore, generally, an individual who pleads guilty to a crime is bound by that conviction and cannot collaterally attack or deny his criminal acts in other legal proceedings. **Department of Transportation v. Mitchell**, 517 Pa. 203, 535 A.2d 581 (1987) (holding that guilty plea established liability in civil case arising from same facts).

Instantly, the trial court concluded that Appellant failed to produce evidence proving that the statement that Appellant had a sexual relationship with a minor was false. The court agreed that under **Nanty-Glo, supra**, the party moving for summary judgment may not rely upon depositions or affidavits of its own witnesses to establish the nonexistence of genuine issues, but noted that the moving party may rely on the testimony of an adverse party. (Trial Court Opinion, 8/30/24, at 29). As the court explained:

> During his guilty plea hearing before Judge Vito P. Geroulo on November 12, 2010, [Appellant] expressly acknowledged that he signed and initialed that written guilty plea colloquy, and "read, understood, and answered truthfully all questions" in it. ([N.T. Guilty Plea, Case No. 10 CR 2613,] 11/12/10 at p.2). Prior to accepting [Appellant's] guilty plea to corruption of a minor, Judge Geroulo directed Assistant District Attorney Patty Lafferty, Esquire, to provide him with

- 14 -

"the facts" supporting the corruption of a minor charge against [Appellant]. (***Id.*** at p.4). Assistant District Attorney Lafferty stated that "[b]etween January of 2008 and July of 2010," [Appellant] "corrupted or tended to corrupt the morals of any minor less than 18 years of age" in that "[Appellant] did repeatedly have inappropriate text messages and contact with a minor." (***Id.*** at pp. 4-5). After Assistant District Attorney Lafferty recited those facts, the following exchange transpired between Judge Geroulo and [Appellant]:

> JUDGE GEROULO: And you admit that between January of '08 and July of 2010, you engaged in the conduct just described by the District Attorney?
>
> [Appellant]: Yes, your Honor.
>
> JUDGE GEROULO: Alright, we'll accept the guilty plea, we'll defer the imposition of sentence pending the pre-sentence investigation.
>
> [Appellant's] COUNSEL: Thank you, sir.

(***Id.*** at p. 5).

(Trial Court Opinion, 9/30/24, at 5-6). The trial court further explained that Appellant's counsel conceded at the time of oral argument on the motion for summary judgment that "the corruption of minor's count in the complaint was consistent with the information in the affidavit." (***Id.***) (citing N.T. Argument, 8/19/24, at 47).

The court continued that

> [w]hile the Memorandum and Order of August 30, 2024 used the wording that [Appellant] was 'collaterally estopped' from disputing his participation in a sexual relationship by virtue of his guilty plea to 'inappropriate text messages' and 'contact' with Ms. DuBorgel, the doctrine of collateral estoppel and its five elements were never cited or expressly applied in the process.

- 15 -

(Trial Court Opinion, 9/30/24, at 12). Nevertheless:

> [Appellant's] "guilty plea is an admission of facts averred in the complaint" and "conclusive proof of the wrongdoing for which he was charged," … and that summary judgment could be granted on that basis.… Those conclusions stemmed from the defenses asserted by Kelly and the Scranton Times in their pleadings and the summary judgment motion that the factual statements in the article of February 14, 2021, "are true or substantially true" and constitute "a fair and accurate summary of the statements made in legal court filings" in [Case No. 10 CR 2613], and that [Appellant's] guilty plea was tantamount to an admission of a sexual relationship with Ms. DuBorgel based upon the only "inappropriate text messages" quoted in the Affidavit of Probable Cause describing their sexual activities.

(*Id.* at 11-12) (record citation omitted). The court further explained that "the only 'inappropriate text messages' contained in the [Case No. 10 CR 2613] file are those which are quoted in the Affidavit of Probable Cause and distinctly acknowledge and describe [Appellant's] sexual relationship with a minor, Ms. DuBorgel." (*Id.* at 12).

Our review of the record supports the trial court's conclusion that Appellant did not meet his burden of proof of establishing the falsity of the statement that he had sexual relations with a minor. *See Lewis, supra*. Rather, the evidence reflects that Appellant pled guilty to sending inappropriate text messages to a minor, and in those messages, Appellant admits to his sexual relationship with a minor. As such, we agree with the trial court that Appellant failed to adduce sufficient evidence establishing a genuine issue of material fact concerning the article's statement that Appellant

pled guilty to corruption of minors and admitted to having a sexual relationship with a 15-year-old girl. As Appellant cannot prove the falsity of the statement, he cannot meet his burden of proof to establish a cause of action for defamation. *See Chenot, supra*; *Lewis, supra*.

In his second sub-issue, Appellant argues that the court erred in finding that the statements concerning Appellant's employment as a realtor and his involvement in the January 6th insurrection were parody. Appellant claims that the article does not specifically disclose that the statements were parody, nor are the claims so wild as to be unbelievable on their face. We disagree.

As this Court has explained:

> Pennsylvania courts have held that certain types of communications, although undoubtedly offensive to the subject, do not rise to the level of defamation. For example, expressions of opinion are not actionable. *Baker v. Lafayette College*, [504 A.2d 247, 252 (Pa.Super. 1986)], *aff'd*, 516 Pa. 291, 532 A.2d 399 (1987). Likewise, statements which are merely annoying or embarrassing or "no more than rhetorical hyperbole" or "a vigorous epithet" are not defamatory. *Redding v. Carlton*, [296 A.2d 880, 881 (Pa.Super. 1972)].

*Kryeski v. Schott Glass Techs., Inc.*, 626 A.2d 595, 600-01 (Pa.Super. 1993), *appeal denied*, 536 Pa. 643, 639 A.2d 29 (1994).

Instantly, the trial court explained:

> [Appellant] alternatively alleges that Kelly made false factual statements by indicating that [Appellant] was "selling rabbit holes" and by displaying an image of an "Unreal-tor" sign in the accompanying cartoon, thereby suggesting "unreality" on [Appellant's] part and questioning his fitness as a realtor in the process. Kelly testified that he viewed [Appellant's] QAnon videos before he authored "an

- 17 -

opinion column" about [Appellant]. Kelly stated that his article did not "raise an inference that [Appellant] is not fit to be a realtor" because of his QAnon activities, but agreed that he utilized a "rabbit hole figuratively" to reference "the QAnon movement and the rabbit holes people go down believing all this nonsensical stuff." Kelly considers the illustration prepared by the Scranton Times' John Cole depicting a rabbit hole and "Unreal-tor" sign to be "a very clever parody on [Appellant's] job as a realtor and what he was doing" in broadcasting baseless QAnon conspiracies.

(Trial Court Opinion, 8/30/24, at 37-38) (record citations and footnote omitted). The trial court explained that the phrase "rabbit holes" is often employed in describing the QAnon movement and its activities. (**Id.** at 39).

With respect to the article's statements that Appellant "happily calls out the cadence" of the QAnon movement and is "a purveyor of poison," the trial court reasoned:

> [Appellant's] final claimed statements of fact concern Kelly's representation that [Appellant] "happily calls out the cadence" of the QAnon movement and is "a purveyor of a poison," which [Appellant] asserts conveys that he bears some responsibility for the "criminal acts" committed during the Capitol riot. Kelly testified that the words "happily calls out the cadence" constituted "figurative language" that referenced [Appellant's] broadcasts on January 6, 2021, when he "said that [Vice President Mike] Pence had been arrested," which statement "got [Appellant] in U.S.A. Today," and [Appellant's] "rallying cry" that the Democratic legislators should be "arrested" and "get executed at top levels." As for the phrase "purveyor of a poison," Kelly indicated that he was referring to "the lies and nonsense and disinformation and misinformation that [Appellant] was spreading on the Internet," such as representing as true that "the real Joe Biden has been executed and the guy who's in the White House is a body double ... in a studio out in Arizona," and "that [Appellant] had traveled in time and talked to Nikola Tesla."

- 18 -

The role of the QAnon movement and its followers in the events at the Capitol on January 6, 2021, has been widely reported in legal literature. … However, Kelly "never said [Appellant] was at the rally" in his article. To the contrary, Kelly's article expressly states that "[Appellant] told me he wasn't at the Capitol on January 6, but he showed up in USA Today's coverage of riot" after "[Appellant] posted on Facebook that Vice President Mike Pence had been arrested."

Once again, [Appellant] has not identified sufficient evidence indicating that Kelly made false factual statements "tying [Appellant] to the criminal insurrection at the Capitol on January 6." Kelly's reference to [Appellant] happily "calling out the cadence" of the QAnon movement is supported by the plethora of QAnon conspiracies broadcasted by [Appellant] on social media and viewed by Kelly prior to authoring his article. The other description of [Appellant] as a "purveyor of poison" constitutes satirical commentary by Kelly based upon [Appellant's] above-quoted QAnon broadcasts, rather than an actionable false statement of fact. Therefore, [Appellees] are entitled to summary judgment due to the absence of sufficient evidence in the record that Kelly or The Scranton Times made a false statement of fact regarding [Appellant] in the article published on February 14, 2021.

(Trial Court Opinion, 8/30/24, at 40-43) (record citations and footnote omitted).

The record supports the trial court's determination. With respect to the cartoon with the "unreal-tor" sign and the description of Appellant selling rabbit holes, we agree with the trial court that rather than factual statements, the depiction and statements constitute parody, which is protected by the First Amendment and cannot form the basis of a defamation cause of action. *See Kryeski, supra*. Additionally, the article's reference to Appellant "calling out the cadence" of the QAnon movement and the claim that he is a "purveyor of

poison" are rhetorical flourish describing Appellant's broadcasts of QAnon conspiracy theories and do not constitute defamatory statements. *See id.* Therefore, we conclude that the trial court did not err when it found that no question of material fact existed regarding whether the cartoon or the statements concerning Appellant's QAnon broadcasts constituted defamatory statements.

In the final sub-issue argued in Appellant's first question presented, Appellant contends that the trial court erred in finding that he failed to present sufficient evidence that Appellees acted with actual malice. Appellant argues that Appellees' actions in printing the article demonstrated their reckless disregard and deviation from acceptable journalistic standards. Specifically, Appellant claims that Kelly failed to consult all relevant documents concerning Case No. 10 CR 2613, and therefore acted recklessly and with serious doubts as to the veracity of the allegations he was making against Appellant. Appellant insists that this Court must reverse the trial court's granting of summary judgment on these grounds. We disagree.

We reiterate that under Pennsylvania law, where the plaintiff asserting a defamation cause of action is a public figure[5] and the allegedly defamatory statement relates to matter of public concern, the plaintiff has an additional burden of proving that the defendant made the false and defamatory

_____

[5] As previously stated, Appellant stipulated that he was a public figure for purposes of this litigation. *See* footnote 2, *supra*.

statements with actual malice. ***DiPaolo v. Times Publ'g Co.***, 142 A.3d 837, 843 (Pa.Super. 2016), *appeal denied*, 640 Pa. 365, 162 A.3d 1116 (2016). ***See also Kuwait & Gulf Link Transport Company v. Doe***, 216 A.3d 1074, 1087 (Pa.Super. 2019), *appeal denied*, 657 Pa. 476, 226 A.3d 92 (2020) (stating: "If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false") (citation omitted). Furthermore, our Supreme Court has explained that while parody of a public figure may constitute defamation under certain circumstances, it is subject to heightened constitutional protections, and in order to establish such claim, public figures must prove actual malice. ***Joseph v. Scranton Times L.P.***, 634 Pa. 35, 72, 129 A.3d 404, 425 (2015).

"The term 'actual malice' (sometimes shortened to 'malice') is a term of art that refers to a speaker's knowledge that his statement is false, or his reckless disregard as to its truth or falsity." ***Id.*** (quoting ***American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania***, 592 Pa. 66, 76 n.6, 923 A.2d 389, 395 n.6 (2007), *cert. denied*, 552 U.S. 1076, 128 S.Ct. 806, 169 L.Ed.2d 606 (2007)). ***See also Hustler Mag., Inc. v. Falwell***, 485 U.S. 46, 57, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (holding actual malice was not shown where parody could not "reasonably be understood as describing actual facts...").

"[T]he requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law." ***Tucker,*** [***supra***] at 626, 848 A.2d at 130 (citation omitted). "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." ***Milkovich*** [***v. Lorain Journal Co.***, 497 U.S. 1, 17, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990)] (quotation marks and quotation omitted). This rule is premised on "the unique character of the interest protected by the actual malice standard." ***Harte–Hanks Communications, Inc. v. Connaughton***, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 2695, 105 L.Ed.2d 562 (1989). More fundamentally, the rule is derived from the recognition that "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" ***Bose Corp.*** [***v. Consumers Union of U.S., Inc.***, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984)].

***Joseph, supra*** at 89, 129 A.3d at 436.

The actual malice requirement "is not met through a showing of ill will or malice in the ordinary sense of the term" or "the failure to investigate even when a reasonably prudent person would have done so." ***Id.*** at 90, 129 A.3d at 436-37. "Rather, actual malice requires at a minimum that statements were made with a reckless disregard for the truth. That is, the defendant must have made the false publication with a 'high degree of awareness ... of probable falsity, or must have entertained serious doubts as to the truth of his publication[.]" ***Id.*** at 90, 129 A.3d at 437 (citations and internal quotation marks omitted). "The fact that [defendant] could have employed a higher degree of journalistic responsibility does not constitute actual malice." ***Coleman v. Ogden Newspapers, Inc.***, 142 A.3d 898, 906 (Pa.Super.

2016), *appeal denied*, 641 Pa. 12, 165 A.3d 873 (2017) (citation omitted).

Instantly, the trial court concluded that Appellant failed to prove through clear and convincing evidence that Appellees acted with actual malice. As the court noted, "[t]he only evidence submitted by [Appellant] in support of his 'actual malice' claim consists of the deposition transcripts of Kelly and The Scranton Times' Executive Editor Holeva." (Trial Court Opinion, 8/30/24, at 48). Reviewing this evidence, the court explained:

> Kelly testified that in preparing the article, he reviewed the Times-Tribune archives, including earlier articles about [Appellant] authored by Jeremy Burton and Denis O'Malley, legal documents, court documents, [and] the criminal affidavit and his guilty plea colloquy, and also interviewed relevant witnesses, including Ciara O'Malley and an individual who was in the law enforcement process involving the criminal charges against [Appellant].

(Trial Court Opinion, 9/30/24, at 18) (internal quotation marks and record citations omitted). The court further explained that after reviewing the unredacted deposition testimony from Mr. Holeva, the editor at the Scranton Times, it found that

> [t]he complete testimony simply references a columnist's ethical obligations and journalistic responsibility. [Mr. Holeva's] testimony is devoid of any indication that Kelly or the Scranton Times either knew that a factual statement concerning [Appellant] was false or subjectively acted with reckless disregard as to its truth or falsity because they had a high degree of awareness of its probable falsity or entertained serious doubts as to its truth.

(*Id.* at 19) (citation omitted). As such, the court concluded that Appellees were entitled to summary judgment based on Appellant's failure to produce

sufficient evidence of actual malice by Appellees.

The record supports the trial court's determination. Appellant had the burden of proving actual malice by a clear and convincing evidence standard and Appellant failed to identify any facts or evidence establishing actual malice by Kelly or The Scranton Times. Appellant's argument provides examples of other research or examinations that Kelly should have undertaken in his investigation of the article, and notes that Kelly discussed with his editor whether he should include portions of the article. However, actual malice is not established by a failure to investigate, or even the fact that a publisher could have employed a higher degree of journalistic responsibility. **See Coleman, supra**. Here, Appellant has not provided any evidence that Kelly had a high degree of awareness of probable falsity in the article, or that Kelly entertained any serious doubts about the truth of the publication. **See Joseph, supra**. Therefore, we agree with the trial court that Appellant cannot prove that Appellees acted with the actual malice necessary to establish his defamation claim, and the trial court did not err in granting summary judgment in favor of Appellees.[6] Accordingly, we affirm.

_____

[6] In his three-sentence discussion of his second issue, Appellant does not develop a separate argument, but simply states that "[f]or the reasons articulated in the analysis of the defamation claims, the [t]rial [c]ourt erred in granting [Appellees'] motion for summary judgment and this Court should reverse that determination." (Appellant's Brief at 51). As there is no merit to any of the issues Appellant raised concerning his defamation claims, we conclude that he has not raised any meritorious issues concerning the court's

*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/15/2025

---

entry of summary judgment in favor of Appellees regarding his false light invasion of privacy claims.

Moreover, we agree with the trial court that under Pennsylvania law, "[t]he required standard of fault in a false light claim is … actual malice." **Rubin v. CBS Broad. Inc.**, 170 A.3d 560, 568 n.9 (Pa.Super. 2017) (footnote omitted).  As discussed, the trial court did not err when it found that Appellant did not prove that Appellees acted with actual malice.  Therefore, Appellant similarly did not meet his burden of proof concerning his false light invasion of privacy claim, and the court did not err in granting summary judgment on this claim as well.